2006 UT App 416

Serge Max D'ELIA and Lilian C.L.S. d'Elia, Trustees of the d'Elia Family Trust UDT dated August 22, 1990, Plaintiffs and Appellants,

v.

RICE DEVELOPMENT, INC., a California corporation; Rice Development, L.L.C., a Utah limited liability company; Gerald H. Rice, an individual; Cherry Hills Associates, L.P.; Bridlevale, Ltd.; and John Does I–XV, Defendants and Appellees.

No. 20050247–CA.

Court of Appeals of Utah.

Oct. 13, 2006.

516

Stephen E.W. Hale and Justin P. Matkin, Salt Lake City, for Appellants.

David C. Wright, Salt Lake City, for Appellees.

Before Judges BILLINGS, DAVIS, and ORME.

## OPINION

BILLINGS, Judge.

¶ 1 Plaintiff trustees Serge Max d'Elia and Lilian C.L.S. d'Elia appeal three trial court rulings, made at the conclusion of a five-day trial, against the d'Elia family trust (the Trust) and in favor of Defendants Gerald H. Rice (Mr. Rice); Rice Development, Inc. (Rice Inc.); Rice Development, LLC (Rice LLC), Cherry Hills Associates, LP; and Bridlevale, Ltd. The Trust argues the trial court erred in determining that (1) Mr. Rice is not the alter ego of Rice Inc. and Rice LLC, (2) the Trust must demonstrate self-dealing to hold Mr. Rice personally liable for Rice Inc.'s and Rice LLC's breaches of fiduciary duty, and (3) the Trust cannot hold Defendants liable for constructive fraud because it cannot show fraudulent intent. We affirm in part and reverse and remand in part.

## BACKGROUND

¶ 2 Mr. Rice is the president and sole shareholder of Rice Inc., a California corporation. Mr. Rice is also the former sole managing member and exclusive owner of

Rice LLC, a now dissolved Utah limited liability company. For the relevant periods, Mr. Rice exercised exclusive control and direction over Rice Inc.'s and Rice LLC's finances and business affairs.

¶ 3 In August 1990, Rice Inc. joined with the Trust to create Cherry Hills Associates LP (Cherry Hills), a California limited partnership. Cherry Hills was the third partnership Rice Inc. and the Trust formed together. Rice Inc., whose principal place of business is California, was the sole general partner of Cherry Hills. The Trust was the sole limited partner. The parties formed and operated Cherry Hills pursuant to a partnership agreement (the Cherry Hills Agreement). The Cherry Hills Agreement stated that the purpose of the partnership was the construction, development, marketing, and sale of 140 single-family homes.

¶ 4 The Trust advanced funds to Cherry Hills and contributed capital by purchasing land for development and transferring that land to the partnership. In return for the Trust's contributed capital, the Cherry Hills Agreement required Cherry Hills to pay the Trust $20,000 from the sale proceeds of each home. In 1993, California's declining economic conditions led the Trust to reduce Cherry Hills's repayment of the Trust's capital from $20,000 to $17,000 for each home. In 1994, the Trust also agreed to forego interest rate payments and repayment on its advanced funds until after Cherry Hills completed the development project. These allowances by the Trust permitted Cherry Hills to more quickly repay its construction loans and to avoid having to postpone completion of the project until after the recession ended.

¶ 5 Rice Inc. did not make any monetary contributions to Cherry Hills. The Cherry Hills Agreement, however, required Rice Inc., as general partner, to provide the time, skills, and effort necessary to successfully manage and operate the partnership and to accomplish Cherry Hills's business purpose. Mr. Rice received a supervision fee in an amount equivalent to 3.75% of the homes'

sale prices. In total, Mr. Rice received $534,767 in supervision fees. Although near the end of the Cherry Hills project's completion, Mr. Rice stopped accepting the supervisory fee in an effort to aid the partnership.

¶ 6 Throughout the Cherry Hills project, Mr. Rice stayed in regular contact with trustee Serge Max d'Elia (Mr. d'Elia). Specifically, Mr. Rice regularly visited Mr. d'Elia at his home, Cherry Hills consistently sent the Trust updates on Cherry Hills's sales and finances, and at each phase of the Cherry Hills project, Mr. Rice sent the Trust a copy of the form the construction lender used to regulate how the construction draws were used.

¶ 7 Mr. d'Elia was also informed of Mr. Rice's one-third ownership interest in Rymco Framing Inc. (Rymco Framing), Rice Inc.'s in-house framing company, and consented to Rice Inc.'s plans to hire Rymco Framing to work on Cherry Hills homes.[1] The Cherry Hills Agreement permitted the parties to enter into contracts with affiliated entities "for any purpose or purposes in furtherance of the business of the [p]artnership[,] so long [as] such contracts [were] on terms that would be appropriate in a contract reached on an arms-length basis with a party not affiliated with either [p]artner or the [p]artnership."

¶ 8 Cherry Hills completed its development project six years after it began, ultimately building and selling all 140 homes. Upon the project's completion, Cherry Hills owed the Trust over $1,044,173 in initial capital contributions and approximately $1,200,276 in advanced funds. Additionally, Rice Inc. accrued a deficit of $1,203,684 in its Cherry Hills capital account that the Cherry Hills Agreement required Rice Inc. to pay by giving the partnership cash in the amount of the deficit. Further, Rice Inc. failed to deposit $17,779 received from home purchasers' option upgrades into Cherry Hills's account—instead depositing these funds in Rice Inc.'s individual account. Finally, Rice Inc. failed to account for $9358 in home sale

---

1. At the time Rymco Framing began the Cherry Hills project, Rice Inc. obtained bids from other, unrelated framing subcontractors to determine that Rymco Framing's prices were aligned with market rates.

proceeds and $21,725 in utility company deposits.

¶ 9 According to Rice Inc.'s federal income tax returns, in 1991, Rice Inc. retained earnings of $725,282. That same year, Mr. Rice took out a personal loan against Rice Inc. for $325,195. In 1992, Rice Inc. had a negative capital balance of $45,133. And in 1998, Rice Inc. reported negative retained earnings of $754,643.

¶ 10 Over the course of the Cherry Hills project, Rice Inc. occasionally paid Mr. Rice a salary. In 1991, Rice Inc. paid Mr. Rice a $122,000 salary. In 1993, Mr. Rice earned a salary of $460,000 from Rice Inc. In both 1993 and 1995, Mr. Rice took "Partner[']s Draw[s]" from Rice Inc. in the amounts of $552,326 and $296,663, respectively.

¶ 11 In July 1994, approximately four years after the formation of Cherry Hills, the Trust and Bowler & Rice LLC, a company owned by Mr. Rice and Randall Bowler, formed Bridlevale Associates Ltd. (Bridlevale), a Utah limited partnership. The Trust and Mr. Rice later bought Bowler's share in Bowler & Rice LLC. In purchasing Bowler's share, Mr. Rice caused $147,000 in Bridlevale funds, one-half of which the Trust owned, to be paid to Bowler without the Trust's consent.

¶ 12 Rice LLC became the sole general partner of Bridlevale. The Trust served as Bridlevale's exclusive limited partner. As with Cherry Hills, the parties formed and operated Bridlevale pursuant to a partnership agreement (the Bridlevale Agreement). According to the Bridlevale Agreement, the parties formed Bridlevale to construct, develop, market, and sell 108 single-family homes. After its formation, Bridlevale began a residential development project in West Valley City, Utah.

¶ 13 Bowler & Rice LLC contributed $55,272 to the Bridlevale project, and in accordance with the Bridlevale Agreement, Rice LLC, as general partner, committed the time, effort, and skill necessary to accomplish Bridlevale's business purpose. As it did with Cherry Hills, the Trust purchased land and transferred the land to Bridlevale for development. Under the terms of the Bridlevale Agreement, which was in all other respects nearly identical to the Cherry Hills Agreement, Bridlevale would only return the Trust's capital at the end of the project when all the homes were built and sold. The agreement also entitled Rice LLC to a supervisory fee that toward the end of the project Rice LLC declined to receive.[2]

¶ 14 At some point during the Bridlevale project, Mr. d'Elia told Mr. Rice that the Trust was having cash flow difficulties and asked Bridlevale to distribute, in violation of the Bridlevale Agreement, any available funds. Mr. Rice informed Mr. d'Elia that there were no Bridlevale funds available, but Mr. Rice did transfer $100,000 from his personal retirement fund to the Trust. Mr. Rice claimed that the transfer was a personal loan and that Mr. d'Elia told Mr. Rice he would repay him when future revenues from the Bridlevale project materialized. The Trust, however, treated and recorded the transfer as a return of capital from Bridlevale. The Trust never repaid Mr. Rice.[3]

¶ 15 Eventually, Bridlevale constructed and sold all 108 homes. At the project's conclusion, Bridlevale owed the Trust $294,255 of the Trust's initial capital contribution. Rice LLC accrued a $237,893 deficit in its capital account that the Bridlevale Agreement required Rice LLC to repay. Additionally, Rice LLC did not account for $25,785 in missing escrow payments made to Bridlevale and $53,450 in missing option and upgrade payments made by Bridlevale home buyers. Further, Rymco Framing LLC (Rymco LLC), a Utah framing company in which Mr. Rice shared an ownership interest, charged Bridlevale $270,315 over the contract prices Rice LLC and Rymco LLC had agreed to for Rymco LLC's work on the development project. Although neither Mr. Rice nor Rice LLC provided an explanation

2. Bridlevale did not pay Rice LLC all its owed supervisory fees, although Rice LLC did receive $455,953 for managing the Bridlevale project.

3. Over the course of both the Cherry Hills and the Bridlevale projects, Mr. Rice contributed personal funds when there was little or no cash flow to the partnerships. The partnerships did not repay Mr. Rice.

for the overcharge, Mr. Rice testified that Rymco LLC's purpose was not to make or lose money but simply to break even. The same year that Rymco LLC overcharged Bridlevale, Rymco LLC's federal income tax return reported an operating profit for the company of $190,586.

¶ 16 In addition to missing and unaccounted for monies, Mr. Rice also misinformed the Trust about the release of $80,679 in Bridlevale improvement bonds. Although Mr. Rice told Mr. d'Elia that West Valley City had not released the bonds and that Bridlevale would distribute the funds to the Trust upon release, Mr. d'Elia later learned from city officials that West Valley City had previously released the bonds. Mr. Rice and Rice LLC apparently used the $80,679 to fund Defendants' legal fees in the present lawsuit.

¶ 17 During the Cherry Hills and Bridlevale projects, Mr. Rice made intercompany loans between Bridlevale, Cherry Hills, and other related and unrelated entities in which Mr. Rice had ownership interests. Specifically, when a company in which Mr. Rice had an ownership interest was cash deficient, Mr. Rice would transfer funds from other entities in which he also had an ownership interest to cover the deficiency. The Trust did not have an ownership interest in some of the entities that provided or received these fund transfers. Over the course of Cherry Hills's and Bridlevale's existence, Mr. Rice transferred thousands of dollars from the partnerships to other entities. In making these intercompany loans, Mr. Rice did not execute promissory notes, provide documentation, formally require repayment, or charge interest. Mr. Rice's entities borrowed interest free from Cherry Hills and Bridlevale while these partnerships faced interest rates of 8% to 10%. For the most part, the Trust was aware of and approved these intercompany loans. The Trust, however, was not aware of the extent to which Mr. Rice loaned his other entities money from Cherry Hills and Bridlevale, and the Trust did not approve of Mr. Rice's practice of failing to document these loans and neglecting to charge interest. Although Mr. Rice's entities failed to repay Cherry Hills a total of $58,187, with a corresponding loss in interest of $60,367, the enti-

ties repaid Bridlevale $85,863 over the amount borrowed, resulting in a net benefit to Bridlevale of $24,998.

¶ 18 Both Mr. d'Elia and Mr. Rice acknowledge that because of their trust in one another, many business practices over the course of their relationship were informal. For example, the parties failed to reduce numerous transactions and fund transfers to writing, and, at times, disregarded their own partnership agreements. As for Rice Inc. and Rice LLC, these entities followed some corporate formalities, such as maintaining separate accounts and ledgers, and disregarded others, such as not requiring Rymco Framing to sign its subcontracts.

¶ 19 In 1998, the Trust filed suit against Defendants. In its complaint, the Trust made twelve claims for relief, including breach of contract, breach of fiduciary duty, alter ego, and fraud. In 2002, the Trust moved for partial summary judgment against Rice Inc. and Cherry Hills for Cherry Hills's failure to repay funds advanced by the Trust. In its motion, the Trust also sought judgment against Mr. Rice, personally, for the debts incurred by Rice Inc. The trial court granted the Trust's motion as to the unpaid debt but denied the motion as to the Trust's alter ego claims.

¶ 20 The trial court conducted a five-day bench trial in fall 2003. The trial court issued a memorandum decision on March 4, 2004, holding Rice Inc. and Rice LLC liable for breaches of contract and for breaches of fiduciary duty for their failure to repay deficits in the Cherry Hills and Bridlevale capital accounts and for their mishandling of partnership funds. The trial court denied the Trust's claims of fraud and alter ego. The trial court entered its findings of fact and conclusions of law and judgment on September 14, 2004. On September 23, 2004, the Trust filed a motion to amend judgment/motion for new trial, asking the court to hold Mr. Rice, Rice Inc., and Rice LLC liable for constructive fraud and Mr. Rice personally liable for Rice Inc.'s and Rice LLC's breaches of fiduciary duty. The trial court denied

the Trust's motion.[4]  The Trust appeals.

## ISSUES AND STANDARDS OF REVIEW

¶ 21 The Trust first challenges the trial court's conclusion that Mr. Rice is not the alter ego of Rice Inc. and Rice LLC. A trial court's decision not "to pierce the corporate veil will be upheld if there is substantial evidence in favor of the judgment." *Colman v. Colman,* 743 P.2d 782, 787 (Utah Ct.App. 1987).

¶ 22 Next, the Trust asserts that the trial court erred in concluding that the Trust cannot hold Mr. Rice personally liable for Rice Inc.'s and Rice LLC's breaches of fiduciary duty unless the Trust can demonstrate that Mr. Rice engaged in self-dealing. " 'Generally, we review a trial court's legal conclusions for correctness, according the trial court no particular deference.' " *Wilcox v. CSX Corp.,* 2003 UT 21, ¶ 6, 70 P.3d 85 (quoting *Wilson Supply, Inc. v. Fradan Mfg. Corp.,* 2002 UT 94, ¶ 11, 54 P.3d 1177) (additional quotations and citation omitted).

¶ 23 Finally, the Trust claims the trial court erred in concluding that the Trust cannot hold Rice LLC, Rice Inc., and Mr. Rice liable for constructive fraud unless the Trust can show Defendants acted with fraudulent intent. Again, we review the trial court's legal conclusions for correctness, granting the trial court no deference. *See id.*

¶ 24 Importantly, we point out that because the parties do not challenge the trial court's lengthy findings of fact, we accept these findings as true in our analysis on appeal. *See Jacobs v. Hafen,* 917 P.2d 1078, 1078 (Utah 1996) ("Neither party challenges the trial court's findings of fact, and [so] we assume them to be correct."); *see also C & Y Corp. v. General Biometrics, Inc.,* 896 P.2d 47, 52 (Utah Ct.App.1995) (explaining that where a party "do[es] not challenge the trial

court's factual findings, we must accept the[ ] finding[s] as true").

## ANALYSIS

¶ 25 On appeal, the Trust disputes the trial court's rulings regarding whether (1) Mr. Rice is the alter ego of Rice Inc. and Rice LLC, (2) the Trust must demonstrate self-dealing to hold Mr. Rice personally liable for Rice Inc.'s and Rice LLC's breaches of fiduciary duty, and (3) the Trust must show fraudulent intent to hold Defendants liable for constructive fraud. We consider each challenge in turn.

### I.  Alter Ego

¶ 26 The Trust challenges the trial court's alter ego determination in two respects. First, the Trust argues the trial court erred in reviewing the Trust's alter ego claim with an eye to the fact that the parties entered into a series of voluntary contractual relationships. Second, the Trust claims the trial court erred in concluding, based on unchallenged factual findings, that Mr. Rice is not the alter ego of Rice Inc. and Rice LLC.[5]

¶ 27 We begin by noting that because Rice Inc. is a California corporation and Rice LLC is a Utah company, we apply California and Utah law, respectively. *See* Restatement (Second) of Conflicts § 307 (1971) ("The local law of the state of incorporation will be applied to determine the existence and extent of a shareholder's liability to the corporation for assessments or contributions and to its creditors for corporate debts."); 17 William Meade Fletcher et al., *Fletcher Cyclopedia of the Law of Private Corps.* § 8326 (rev. ed. 2006) ("[L]iability of a shareholder for corporate debts and the extent and character of that liability are to be determined by the law of the incorporating state ...."). However, because California and Utah differ little in their alter ego doctrines, there is no need to bifurcate our alter ego analysis. *See Cas-*

---

4.  Because we reverse and remand, we have no occasion to determine whether the trial court abused its discretion in denying the Trust's motion to amend judgment/motion for new trial.

5.  In *Ditty v. CheckRite, Ltd.,* 973 F.Supp. 1320 (D.Utah 1997), a federal district court determined that under Utah law the corporate veil

piercing doctrine equally applies to Utah liability companies. *See id.* at 1335 (noting that although "there is little case law discussing veil piercing theories outside the corporate context, most commentators assume that the doctrine applies to limited liability companies" and citing a number of commentators).

cade Energy & Metals Corp. v. Banks, 896 F.2d 1557, 1575 n. 18 (10th Cir.1990) (comparing Utah and California state law and stating that "California's standard for piercing the corporate veil does not appear to be materially different from Utah's").

¶ 28 The Trust first argues that the trial court erred in closely scrutinizing the Trust's alter ego claim on the basis that the Trust entered into a number of voluntary contractual relationships with Rice Inc. and Rice LLC. We disagree. The voluntary contractual nature of the parties' relationships was simply one of multiple factors to which the trial court gave weight in making its highly factual alter ego determination. Further, the trial court's consideration of the parties' voluntary contractual relationships accurately reflects the fact that "[c]ourts have been extraordinarily reluctant to lift the veil in contract cases, such as this one, where the 'creditor has willingly transacted business' with the corporation." Perpetual Real Estate Servs., Inc. v. Michaelson Props., Inc., 974 F.2d 545, 550 (4th Cir.1992) (quoting United States v. Jon–T Chems., Inc., 768 F.2d 686, 693 (5th Cir.1985)); see also Cambridge Elecs. Corp. v. MGA Elecs., Inc., 227 F.R.D. 313, 331 n. 50 (C.D.Cal.2004) (stating that "[c]ourts are less likely to apply the alter ego doctrine where the party seeking to invoke it ... voluntarily transacted business with the corporate entity"); Centurian Corp. v. Fiberchem, Inc., 562 P.2d 1252, 1253 (Utah 1977) (declining to pierce corporate veil and alluding to facts demonstrating defendant entered into contract with plaintiff voluntarily and fully aware of circumstances and risks); 1 William Meade Fletcher et al., Fletcher Cyclopedia of the Law of Private Corps. § 41.85 (rev. ed.1999) (stating that, in general, courts are less likely to pierce the corporate veil in contract cases than in tort cases because the "injured party in contract cases ha[s] the opportunity to select the entity with whom he or she contracted").

¶ 29 In sum, the Trust does not dispute that it voluntarily entered into the Cherry Hills Agreement with Rice Inc. and the Bri-

dlevale Agreement with Rice LLC.[6] Accordingly, we conclude that in making its alter ego determination, the trial court appropriately considered the voluntary contractual nature of the parties' relationships.

¶ 30 Next, the Trust challenges the trial court's conclusion that Mr. Rice is not the alter ego of Rice Inc. and Rice LLC. "Ordinarily, a corporation is regarded as a separate and distinct legal entity from its stockholders." Salt Lake City Corp. v. James Constructors, Inc., 761 P.2d 42, 46 (Utah Ct.App.1988) (quotations and citation omitted). Because "[t]he purpose of such separation is to insulate the stockholders from the liabilities of the corporation," courts are very reluctant to pierce the corporate veil. Id. As a result, courts have held that two circumstances must exist

> to disregard the corporate entity under the equitable alter ego doctrine ...: "(1) [s]uch a unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist, but the corporation is, instead, the alter ego of one or a few individuals; and (2) if observed, the corporate form would sanction a fraud, promote injustice, or result in an inequity."

Envirotech Corp. v. Callahan, 872 P.2d 487, 499 (Utah Ct.App.1994) (quoting Colman v. Colman, 743 P.2d 782, 786 (Utah Ct.App. 1987)); accord Pearl v. Shore, 17 Cal.App.3d 608, 95 Cal.Rptr. 157, 163 (1971). Courts have referred to the first prong of the alter ego test as the "formalities requirement," in reference to the corporate formalities imposed by statute. James Constructors, 761 P.2d at 47 (quotations and citation omitted). Significant factors courts consider under the first prong are:

> (1) undercapitalization of a one-man corporation; (2) failure to observe corporate formalities; (3) nonpayment of dividends; (4) siphoning of corporate funds by the dominant stockholder; (5) nonfunctioning of other officers or directors; (6) absence of corporate records; (7) the use of the

---

6. Notably, the Trust entered into two other partnership agreements with Rice Inc. prior to its entry into the Cherry Hills Agreement.

corporation as a facade for operations of the dominant stockholder or stockholders; and (8) the use of the corporate entity in promoting injustice or fraud.

*Colman,* 743 P.2d at 786; *see also Virtualmagic Asia, Inc. v. Fil–Cartoons, Inc.,* 99 Cal.App.4th 228, 121 Cal.Rptr.2d 1, 13 (2002) (listing "numerous factors" considered by California courts in determining whether to apply the alter ego doctrine). Courts term the second prong the "fairness requirement," and its satisfaction is left "to the conscience of the court." *James Constructors,* 761 P.2d at 47 (quotations and citation omitted). To satisfy the fairness prong under California law, the plaintiff cannot merely show difficulty in satisfying debt. *See Oncology Therapeutics Network Connection v. Virginia Hematology Oncology PLLC,* No. C05–3033WDB, 2006 WL 334532, at *19, 2006 U.S. Dist. LEXIS 5152, at *58 (N.D.Cal. Feb.10, 2006) (applying and interpreting California law). "Instead, [the] plaintiff must provide evidence of 'bad faith.'" *Id.; see also Sonora Diamond Corp. v. Superior Court,* 83 Cal.App.4th 523, 99 Cal.Rptr.2d 824, 837 (2000).

¶ 31 Here, the trial court, in declining to pierce the corporate veil, relied on evidence that Mr. d'Elia and the Trust encouraged, participated, and sanctioned the informal business activities that the Trust now claims justify disregard for the corporate entity. In reaching its decision, the trial court also relied on evidence that Defendants did not siphon funds. The record reveals that substantial evidence exists to support the trial court's decision not to pierce the corporate veil.

¶ 32 First, the record demonstrates that Rice Inc. and Rice LLC appropriately followed certain internal corporate formalities. Second, with regard to Defendants' failure to follow certain other corporate formalities, the record reveals that Mr. d'Elia and the Trust were not only complicit, but at times promoted and engaged, themselves, in the informal, and arguably lax, business practices that the Trust argues render Mr. Rice liable. Finally, the record indicates that although Mr.

Rice received distributions from Rice Inc. and Rice LLC, these distributions were not inappropriate since the parties made no agreement that Mr. Rice should forego all remuneration, such as a salary, and risk his own personal wealth in the wake of the Cherry Hills and Bridlevale projects.

¶ 33 We further note that in affirming the trial court's alter ego determination, we do not condone the clearly inappropriate actions by Defendants of failing to account for missing monies, overcharging Bridlevale for Rymco LLC's framing work, misrepresenting the status of the $80,679 improvement bond, and using that bond to fund their individual legal fees. However, we agree with the trial court that such wrongs are more appropriately remedied as breaches of fiduciary duties.

¶ 34 In short, we conclude that substantial record evidence exists to support the trial court's determination not to pierce the corporate veil. We therefore affirm the trial court's alter ego determination.

## II. Breaches of Fiduciary Duty

¶ 35 The Trust maintains the trial court erred in determining that the Trust needed to show self-dealing to hold Mr. Rice personally liable for Rice Inc.'s and Rice LLC's breaches of fiduciary duty to the Trust. We agree.

¶ 36 We begin by noting that "[i]n Utah, a claim for breach of fiduciary duty is an independent tort that, on occasion, arises from a contractual duty." *Norman v. Arnold,* 2002 UT 81, ¶ 35, 57 P.3d 997; *see also* Restatement (Second) of Torts § 874 cmt. b (1979) ("A fiduciary who commits a breach of his duty as a fiduciary is guilty of tortious conduct to the person for whom he should act."). Here, the fiduciary duties Rice Inc. and Rice LLC, as general partners, owed the Trust, as limited partner, arose independent of any contractual duties, *see* Utah Code Ann. § 48–1–18 (2002) (stating that partners are accountable as fiduciaries to partnership),[7] and therefore, a breach of those fidu-

---

7. Utah Code section 48–2a–1105 directs that "[i]n any case not provided for in [the Utah Revised Uniform Limited Partnership Act,] the provisions of Title 48, Chapter 1, Uniform Part-

ciary duties sounds in tort, *see Kona Enters. v. Estate of Bishop,* 229 F.3d 877, 886 (9th Cir.2000) ("[A] breach of fiduciary duty claim sounds in tort where the duties allegedly breached arise as a matter of law from the fiduciary relationship between partners and not from a contractual agreement."). Because we conclude that the Trust's breaches of fiduciary duty claims sound in tort, it is necessary, under the "most significant relationship" approach to choice of law issues, to apply Utah law to the Trust's claims involving Rice LLC and California law to the Trust's claims involving Rice Inc. *See Waddoups v. Amalgamated Sugar Co.,* 2002 UT 69,¶ 18, 54 P.3d 1054.

## A. *Rice LLC*

¶ 37 We first address whether the Trust is required to show self-dealing to hold Mr. Rice personally liable for Rice LLC's breach of fiduciary duties. To begin, we note that under Utah law, Mr. Rice, as a member of Rice LLC, enjoys limited liability. *See* Utah Code Ann. § 48–2c–601 (2002). The Utah Revised Limited Liability Company Act (the Utah LLC Act) provides that, subject to several exceptions not applicable here, "no organizer, member, manager, or employee of a company is personally liable under a judgment, decree, or order of a court, or in any other manner, for a debt, obligation, or liability of the company." *Id.; see also id.* § 48–2c–602 (listing exceptions to limited liability). Thus, we must first determine whether the Trust can hold Mr. Rice personally liable under any circumstances given his limited liability protection under the Utah LLC Act.

¶ 38 The Trust argues that Mr. Rice can be held personally liable under the Utah Supreme Court case of *Armed Forces Insurance Exchange v. Harrison,* 2003 UT 14, 70 P.3d 35. In *Harrison,* the Utah Supreme Court stated that " 'an officer or director of a corporation is not personally liable for torts of the corporation or of its other officers and agents merely by virtue of holding corporate office, *but can only incur personal liability by participating in the wrongful activity.*' " *Id.* at ¶ 19, 70 P.3d 35 (emphasis added) (quoting 3A William Meade Fletcher et al.,

*Fletcher Cyclopedia of the Law of Private Corps.* § 1137 (rev. ed.2002) ). Based on this statement of the law, the *Harrison* court determined that the defendant corporate officer in the case could "be held liable for fraudulent acts that [he or] she personally committed or in which [he or] she participated." 2003 UT 14 at ¶ 20, 70 P.3d 35.

¶ 39 Several courts and commentators make it clear that holding an officer or director personally liable for corporate torts in which they participate is distinct from the piercing the veil doctrine. *See, e.g., L.C.L. Theatres, Inc. v. Columbia Pictures Indus., Inc.,* 619 F.2d 455, 457 (5th Cir.1980) (stating that "[a]n officer or any other agent of a corporation may be personally as responsible as the corporation itself for tortious acts when participating in the wrongdoing" and that "[i]n these circumstances, it is not necessary that the corporate veil be pierced or even discussed" (additional quotations and citation omitted) ); Edward Brodsky & M. Patricia Adamski, *Law of Corporate Officers and Dirs.: Rights, Duties and Liabilities* § 20.1 (1984) ("An officer, director[,] or shareholder is liable for torts personally committed, without regard to any concept of disregard of the corporate entity.").

¶ 40 For this court to apply *Harrison* to the present case, however, we must determine that a limited liability company member or manager, like a corporate officer or director, can incur personal liability for participating in the company's tortious conduct. Several state courts that have imposed personal liability on limited liability company members and managers for a company's tortious acts have done so in accordance with state statutes. *See, e.g., Sykes v. Hengel,* 394 F.Supp.2d 1062, 1078 (S.D.Iowa 2005) (explaining that Iowa statute makes an express exception to the limited liability of company members where member participates in company's tortious conduct); *People v. Pacific Landmark, LLC,* 129 Cal.App.4th 1203, 29 Cal.Rptr.3d 193, 199 (2005) (interpreting language of California statute discussing personal liability of limited liability company officers and managers to allow parties to hold

nership Act, govern." Utah Code Ann. § 48–2a– 1105 (2002).

officers and managers liable for their personal participation in company's tortious conduct).

¶ 41 Nonetheless, other states have determined that even absent an express statutory exception, a member or manager of a limited liability company can be held liable for tortious acts. *See, e.g., Salzano v. Goulet,* No. CV0402875675, 2005 WL 1154225, at *6, 2005 Conn.Super. LEXIS 1071, at *20–22 (Conn.Super. Ct. April 18, 2005); *Rothstein v. Equity Ventures, LLC,* 299 A.D.2d 472, 474, 750 N.Y.S.2d 625 (2002). For example, in *Rothstein v. Equity Ventures, LLC,* the court held—despite the New York limited liability company statute's failure to enumerate it as one of the express exceptions to limited liability—that members can be held liable for their participation in the company's tortious conduct. *See id.* at 474, 750 N.Y.S.2d 625; *see also* N.Y. Ltd. Liab. Co. Law § 609 (Gould 2006).

¶ 42 In both *Salzano v. Goulet* and *Rothstein,* the courts imposed personal liability on limited liability company members and managers on the basis that the same principles justifying courts' decisions to hold corporate officers personally liable for their participation in a corporation's tortious acts equally apply to limited liability companies. *See Salzano,* 2005 WL 1154225, at *6, 2005 Conn.Super. LEXIS 1071, at *20–22 (reasoning that because of "the corporate-styled liability shield afforded by the limited liability structure, . . . the[ ] principles [of holding a corporation officer liable for participation in the corporation's torts] are equally applicable to the manager of a limited liability company"); *Rothstein,* 299 A.D.2d at 474, 750 N.Y.S.2d 625 ("[M]embers of limited liability companies, such as corporate officers, may be held personally liable if they participate in the commission of a tort in furtherance of company business.").

¶ 43 We are persuaded by those authorities that hold that both limited liability members and corporate officers should be treated in a similar manner when they engage in tortious conduct. We therefore conclude that *Harrison's* imposition of personal liability on corporate officers who participate in a corporation's tortious acts, *see* 2003 UT 14 at ¶ 19, 70 P.3d 35, also applies to limited liability members or managers. Accordingly, the trial court erred in determining that the Trust had to show self-dealing to hold Mr. Rice personally liable for Rice LLC's tortious acts. To be clear, the proper legal standard is not whether Mr. Rice engaged in self-dealing, but whether he participated in Rice LLC's tortious breach of fiduciary duties.

¶ 44 We also conclude, based on the trial court's unchallenged findings, that Mr. Rice did in fact repeatedly participate in those Rice LLC activities that the trial court held to constitute a breach of fiduciary duties. Here, the trial court found that Rice LLC breached its fiduciary duties to the Trust by

(a) failing to provide an accounting for why Rymco Framing LLC charged Bridlevale $270,315 over the amount of the subcontract price for framing Bridlevale Homes; (b) failing to account for $25,785 from escrow payments made to Bridlevale that were missing; (c) . . . failing to account for $53,450 from option and upgrade payments made to Rice LLC for Bridlevale [h]omes that was missing; (d) . . . authorizing the practice of making undocumented interest-free loans to and from Bridlevale to and from . . . [Mr.] Rice [r]elated [e]ntities, and (e) . . . using $80,679 from the improvement bond with West Valley City that belonged to Bridlevale.

Further, the trial court found that: "Mr. Rice exclusively controlled and directed the finances, businesses, and affairs of . . . Rice LLC"; Mr. Rice failed to explain Rymco LLC's $270,315 overcharge; Mr. Rice made the undocumented, interest-free intercompany loans to his affiliated entities; and "Mr. Rice used the $80,679 belonging to Bridlevale . . . to fund his legal fees, and those of . . . Bridlevale."

¶ 45 In summary, we conclude the unchallenged findings demonstrate that Mr. Rice personally participated in Rice LLC's breach of fiduciary duties. Therefore, we reverse and remand to the trial court to determine and award damages.

B. *Rice Inc.*

¶ 46 We also conclude that the Trust is not required to show self-dealing under California law to hold Mr. Rice personally liable for Rice Inc.'s breach of fiduciary duties. Like Utah, California regards the fiduciary duties owed by general partners to limited partners as "imposed by law, and their breach sounds in tort." *Enea v. Superior Court*, 132 Cal.App.4th 1559, 34 Cal. Rptr.3d 513, 519 (2005) (rejecting the argument that "the law declare[s] that partners owe each other only those duties they explicitly assume by contract"). And California courts also similarly hold that while "[d]irectors and officers of a corporation are not rendered personally liable for its torts merely because of their official positions, ... [they] may become liable if they directly order[ ], authorize[,] or participate[ ] in the tortious conduct." *Wyatt v. Union Mortgage Co.*, 24 Cal.3d 773, 157 Cal.Rptr. 392, 598 P.2d 45, 52 (1979).

¶ 47 We further conclude that the trial court's unchallenged factual findings reveal that Mr. Rice directly ordered, authorized, or participated in Rice Inc.'s breach of fiduciary duties to the Trust. Specifically, the trial court found that Rice Inc. breached its fiduciary duties to the Trust by

(a) failing to account for $17,779 deposited directly into Rice Inc.'s bank account for option upgrades for Cherry Hills [h]omes that was never deposited into a Cherry Hills account; (b) failing to account for $9,358 that was missing from the sales of Cherry Hills [h]omes; (c) ... failing to account for $21,725 of missing deposits made by Cherry Hills to utility companies for the Cherry Hills [p]roject; and (d) ... authorizing and directing the practice of making undocumented interest-free loans from and to Cherry Hills to or from ... [Mr.] Rice['s a]ffiliated [e]ntities.

The trial court also found that: "Mr. Rice exclusively controlled and directed the finances, businesses, and affairs of Rice Inc." and that "Mr. Rice caused hundreds of thousands of dollars to be transferred to or from Cherry Hills'[s] ... accounts to [Mr.] Rice['s a]ffiliated [e]ntities."

¶ 48 In short, we conclude the trial court's unchallenged findings demonstrate Mr. Rice ordered, authorized, or participated in Rice Inc.'s breach of fiduciary duties. We therefore reverse and remand for the trial court to determine and award damages.

### III. Constructive Fraud

¶ 49 The Trust contends the trial court erred in determining that the Trust must show fraudulent intent to hold Defendants liable for constructive fraud. We agree.

¶ 50 Under Utah's "most significant relationship" approach for determining choice of law issues for tort claims such as fraud, it is necessary to apply Utah law to the Trust's constructive fraud claims involving Rice LLC and California law to the Trust's constructive fraud claims involving Rice Inc. *See Waddoups v. Amalgamated Sugar Co.*, 2002 UT 69, ¶ 18, 54 P.3d 1054.

A. *Rice LLC*

¶ 51 To demonstrate constructive fraud in Utah, a party need only demonstrate "two elements: (i) a confidential relationship between the parties; and (ii) a failure to disclose material facts." *Jensen v. IHC Hosps.*, 944 P.2d 327, 339 (Utah 1997). Accordingly, the trial court erred in ruling that the Trust needed to show fraudulent intent to hold Rice LLC liable for constructive fraud. *See id.*

¶ 52 Furthermore, because the parties do not challenge the trial court's extensive findings and these findings sufficiently satisfy the elements of constructive fraud as to Rice LLC, we conclude Rice LLC is in fact liable for constructive fraud. *See Flying Diamond Oil Corp. v. Newton Sheep Co.*, 776 P.2d 618, 622 (Utah 1989) ("[R]emand is not necessary if the evidence in the record is undisputed and the appellate court can fairly and properly resolve the case on the record before it.").

¶ 53 First, the unchallenged findings clearly indicate that Rice LLC failed to disclose material facts. For example, the findings reveal that although Rice LLC repeatedly told the Trust that West Valley City had not released the $80,679 bond, the city had in

fact released the bond and Rice LLC was using the bond money to fund its own legal fees.

¶ 54 Second, it is clear that a confidential relationship existed between the Trust and Rice LLC. In Utah, the establishment of a fiduciary relationship satisfies the confidential relationship prong of a constructive fraud claim. For example, in the recent case of *Russell v. Lundberg*, 2005 UT App 315, 120 P.3d 541, this court stated that a "constructive fraud claim ... requires a fiduciary or confidential relationship as an element." *Id.* at ¶ 26, 120 P.3d 541. The court in *Von Hake v. Thomas*, 705 P.2d 766 (Utah 1985), also appeared to use the terms fiduciary relationship and confidential relationship interchangeably. *See id.* at 769–70. Finally, in *Blodgett v. Martsch*, 590 P.2d 298 (Utah 1978), the supreme court acknowledged that "[t]here are a few relationships (such as ... attorney-client [and] trustee-cestui) which the law presumes to be confidential." *Id.* at 302.

¶ 55 Thus, the above cases indicate that in Utah, a fiduciary relationship and a confidential relationship are considered one and the same. *See First Sec. Bank N.A. v. Banberry Dev. Corp.*, 786 P.2d 1326, 1332 & n. 18 (Utah 1990) (using the terms interchangeably and citing cases for the proposition that fiduciary relationship and confidential relationship are ordinarily convertible terms). Because in Utah, a fiduciary relationship exists as a matter of law between general and limited partners, *see* Utah Code Ann. § 48–1–18 (stating that partners are accountable as fiduciaries to partnership), the confidential relationship element of constructive fraud is satisfied with regard to Rice LLC.

¶ 56 Consequently, we conclude that Rice LLC is liable for constructive fraud. We therefore reverse and remand for the trial court to determine and award damages.

**B.** *Rice Inc.*

¶ 57 Under California statute, constructive fraud is defined as "any breach of duty which, without an actually fraudulent intent, gains an advantage to the person in fault, or anyone claiming under him, by misleading another to his prejudice, or to the prejudice of anyone claiming under him." Cal. Civ.Code § 1573(1) (West 2006);[8] *see also Tyler v. Children's Home Soc'y*, 29 Cal. App.4th 511, 35 Cal.Rptr.2d 291, 312 (1994) ("Constructive fraud arises on a breach of duty by one in a confidential or fiduciary relationship to another which induces justifiable reliance by the latter to his prejudice." (emphasis, quotations, and citation omitted)). Accordingly, California law makes it clear that a showing of fraudulent intent is not a requisite element of constructive fraud. *See Tyler*, 35 Cal.Rptr.2d at 312. We therefore conclude the trial court erred in determining that the Trust must show fraudulent intent to hold Rice Inc. liable for constructive fraud.

¶ 58 We further conclude that the unchallenged trial court findings indicate that the requisite elements of constructive fraud are satisfied. *See Flying Diamond Oil Corp. v. Newton Sheep Co.*, 776 P.2d 618, 622 (Utah 1989). First, it is evident that where Rice Inc. owed the Trust a fiduciary duty as a matter of law, *see* Cal. Corp.Code § 16404 (West 2006); *see also Johnson v. Superior Court*, 38 Cal.App.4th 463, 45 Cal.Rptr.2d 312, 319 (1995), a fiduciary relationship existed between the parties. *See Daly v. Yessne*, 131 Cal.App.4th 52, 31 Cal.Rptr.3d 420, 429 (2005) ("A breach of fiduciary duty involves the existence of a fiduciary relationship ...." (quotations and citation omitted)).

¶ 59 Second, as the trial court determined, Rice Inc. breached its duties to the Trust in failing to account for, or disclose the reasons for, monies deposited in its bank account rather than the Cherry Hills account, monies missing from sales of Cherry Hills homes, and missing deposits made by Cherry Hills to utility companies for the Cherry Hills project. *See American Trust Co. v. California W. States Life Ins. Co.*, 15 Cal.2d 42, 98

---

8. California Civil Code section 1573 also states that constructive fraud is "any such act or omission as the law specially declares to be fraudu-

lent, without respect to actual fraud." Cal. Civ. Code § 1573(2) (West 2006).

P.2d 497, 504 (1940) (stating that nondisclosure cannot "amount to constructive fraud unless the party is a fiduciary with a duty to disclose").

¶ 60 Finally, to demonstrate constructive fraud, a party must show reliance and resulting injury. *Tyler,* 35 Cal.Rptr.2d at 312; *see also* Cal. Civ.Code § 1573(1). Notably, with claims of constructive fraud, "the reliance element is relaxed ... to the extent we may presume reasonable reliance upon the misrepresentation or nondisclosure of the fiduciary." *Estate of Gump,* 1 Cal. App.4th 582, 2 Cal.Rptr.2d 269, 281 (1991). That is, in the present case, "a rebuttable presumption of reasonable reliance is created because of [the parties'] relationship as partners." *Edmunds v. Valley Circle Estates,* 16 Cal.App.4th 1290, 20 Cal.Rptr.2d 701, 708 (1993) ("This rebuttable presumption implements the long recognized public policy of imposing fiduciary duties upon partners in their relationship to one another."). And this presumption of reasonable reliance is only overcome where there is "substantial evidence to the contrary." *Id.; see also Estate of Gump,* 2 Cal.Rptr.2d at 281. Here, Rice Inc. does not contest its failure to account for or disclose to the Trust the missing monies and the partnership money that it deposited into its own account rather than Cherry Hills's account.

¶ 61 Thus, we conclude that, based on the unchallenged trial court findings, Rice Inc. is liable for constructive fraud. We therefore reverse and remand for the trial court to determine and award damages.

## C. *Mr. Rice*

¶ 62 As previously determined in our analysis, in Utah, limited liability members and managers who participate in a company's tortious acts can be held personally liable for those acts. Accordingly, the Trust is not required to show fraudulent intent to hold Mr. Rice liable for Rice LLC's acts of constructive fraud. Rather, to hold Mr. Rice liable, the Trust must demonstrate that Mr. Rice participated in Rice LLC's tortious conduct. Here, the unchallenged findings demonstrate that Mr. Rice, as the sole owner and managing partner of Rice LLC, "exclusively controlled and directed the finances, business, and affairs" of Rice LLC. Under these particular circumstances, it is unquestionable that Mr. Rice, bestowed with exclusive control and direction of Rice LLC, participated in the company's acts of constructive fraud. Therefore, we conclude that Mr. Rice is personally liable for Rice LLC's constructive fraud.

¶ 63 Additionally, as we noted earlier, under California law, a corporation's directors and officers can be held personally liable when they "directly order[ ], authorize[,] or participate[ ] in the [corporation's] tortious conduct." *Wyatt v. Union Mortgage Co.,* 24 Cal.3d 773, 157 Cal.Rptr. 392, 598 P.2d 45, 52 (1979). Thus, it is likewise unnecessary that the Trust show fraudulent intent to hold Mr. Rice liable for Rice Inc.'s alleged constructive fraud. Further, because the unchallenged findings reveal that Mr. Rice, as the president and sole shareholder of Rice Inc., "exclusively controlled and directed the finances, businesses, and affairs of Rice Inc.," we conclude that under such circumstances Mr. Rice is personally liable for Rice Inc.'s constructive fraud.

¶ 64 Accordingly, because we conclude that Mr. Rice is liable for both Rice LLC's and Rice Inc.'s constructive fraud, we reverse and remand to the trial court to determine and award damages.

## CONCLUSION

¶ 65 We affirm the trial court's alter ego determination. But we conclude that Mr. Rice is personally liable for those breaches of fiduciary duty committed by Rice Inc. and Rice LLC and remand for the trial court to determine and award damages. Additionally, we conclude that Rice LLC, Rice Inc., and Mr. Rice are liable for constructive fraud, and we remand to determine and award damages.

¶ 66 WE CONCUR: JAMES Z. DAVIS and GREGORY K. ORME, Judges.