2019 UT App 1

## THE UTAH COURT OF APPEALS

CHAD ESKELSEN AND LORNA ESKELSEN,
Appellants,
*v.*
THETA INVESTMENT COMPANY,
Appellee.

Opinion
No. 20160955-CA
Filed January 4, 2019

Fifth District Court, St. George Department
The Honorable Jeffrey C. Wilcox
No. 120500400

Daniel J. Tobler, Attorney for Appellants

Bryan J. Pattison, Attorney for Appellee

JUDGE MICHELE M. CHRISTIANSEN FORSTER authored this Opinion, in which JUDGES KATE APPLEBY and JILL M. POHLMAN concurred.

CHRISTIANSEN FORSTER, Judge:

¶1     Chad Eskelsen and Lorna Eskelsen appeal from the trial court's judgment in favor of Theta Investment Company (Theta). We affirm.

BACKGROUND

¶2     In August 2007, JENCO LC and VC Holdings LLC teamed up to purchase real property (the Property) in St. George, Utah. Gilbert Jennings formed, and was the manager of, JENCO. Vaughn Hansen and Carolyn Hansen formed VC Holdings in 2005. VC Holdings was a manager-managed company, and the Hansens were the company's only members. Together, the two companies purchased the Property, with JENCO receiving a 68.2% interest in the Property and VC Holdings receiving a

31.8% interest. Shortly after purchasing its interest in the Property, VC Holdings named Mr. Hansen as manager.

¶3    In March 2008, JENCO and VC Holdings formed JVC Leasing LC, and Mr. Jennings was appointed manager of the company. A few months later, JENCO and VC Holdings transferred 100% of their respective interests in the Property to JVC Leasing. In return, JENCO received a 68.2% interest in JVC Leasing, and VC Holdings received a 31.8% interest in JVC.

¶4    In May 2009, the Eskelsens loaned the Hansens $120,000. The Hansens signed a promissory note for the full amount of the loan, and, as security for the loan, they executed a "Limited Liability Company Membership Interest Pledge Agreement," pledging to the Eskelsens 100% of the total issued and outstanding membership interests in VC Holdings. Importantly, VC Holdings was not a party to the promissory note.

¶5    In June 2010, the Hansens defaulted on the promissory note, and the Eskelsens hired attorney Daniel J. Tobler to help them collect on the promissory note.[1] The Eskelsens also filed a UCC-1 financing statement with the Utah Department of Commerce to perfect their security interest in 100% of the membership interests in VC Holdings.[2]

---

1. Mr. Tobler is also representing the Eskelsens on appeal.

2. "A financing statement is a document stating that an entity/individual (secured party) has a claim (security interest) in certain property (collateral) belonging to another entity/individual (debtor). For example, a business owner borrows money from a bank and uses the assets of a business as collateral for the loan. The bank as the 'secured party' will most likely file a financing statement with the UCC Office within the Division of Corporations. By filing a financing statement, the bank establishes its priority over the collateral in the event the

(continued…)

¶6    In late December 2010, as part of his collection efforts, Mr. Tobler sent a letter (the Foreclosure Letter) to the Hansens, stating that the Eskelsens were "accepting [the Hansens'] total issued and outstanding membership interests in VC Holdings" "in full satisfaction" of the promissory note. The letter stated that the Eskelsens "were the sole members of VC Holdings" and that they were removing the Hansens as members and managers of the company. Finally, the letter said the Hansens had twenty days to object to the Eskelsens' proposal.

¶7    Mr. Tobler also sent a letter to JVC Leasing in care of Mr. Jennings. That letter stated that the Eskelsens "have elected to be admitted as members of VC Holdings, and are now managers of the same. Thus all notices from JVC Leasing, LC, and payments or distributions for VC Holdings, LLC's 31.8% interest in JVC Leasing, LC, shall be paid to the Eskelsens at the address listed below." The letter did not include a copy of the Foreclosure Letter sent to the Hansens or the loan documents between the Eskelsens and the Hansens. In addition, the letter did not state that Mr. Hansen would be removed as manager of VC Holdings.

¶8    In January 2011, Mr. Tobler received a telephone call from another attorney, Mr. Blanchard, who was calling as a favor to the Hansens. Mr. Blanchard stated that his firm officially represented Mr. Jennings. Mr. Blanchard also stated that he did not believe the Eskelsens had properly foreclosed on the Hansens' membership interests in VC Holdings, but he nevertheless suggested a compromise whereby Mr. Hansen would broker a sale of the Property to Mr. Jennings (through one of Mr. Jennings's entities) and place in escrow the proceeds of

_____

(…continued)
business owner files for bankruptcy or becomes insolvent." Utah Dep't of Commerce, Division of Corps. & Commercial Code, *Uniform Commercial Code: Frequently Asked Questions*, https://corp orations.utah.gov/ucc-cfs/ucc.html [https://perma.cc/6WY3-4TF3].

the sale. The Hansens and the Eskelsens could then determine how the proceeds should be distributed. Mr. Tobler agreed to consult with the Eskelsens and to contact Mr. Blanchard with their answer.

¶9 After his discussion with Mr. Blanchard, Mr. Tobler received a letter from Mr. Jennings in response to Mr. Tobler's December 2010 letter. Mr. Jennings asked for "documentary proof of the transition of ownership" of VC Holdings. He also stated that VC Holdings was "indebted to [JVC Leasing] in the amount of $54,270.50" and suggested that the Eskelsens contact him to "work out a repayment plan." Mr. Tobler never provided Mr. Jennings or Mr. Blanchard with the Foreclosure Letter or the signed agreement between the Eskelsens and the Hansens. He also never provided Mr. Jennings or Mr. Blanchard with the requested "documentary proof" of the transfer of ownership of VC Holdings.

¶10 According to Mr. Jennings, after he received the Eskelsens' December 27, 2010 letter, he consulted with Mr. Hansen about the Eskelsens' claims. Mr. Jennings testified that Mr. Hansen claimed that he (Mr. Hansen) was still the owner of VC Holdings. Mr. Jennings also searched Utah's Department of Commerce website and found that Mr. Hansen was still listed as VC Holdings' manager.

¶11 In January 2011, Mr. Tobler contacted Mr. Blanchard and informed him that the Eskelsens would agree to the proposed escrow agreement. Both attorneys later testified that they understood that the Eskelsens, the Hansens, and Mr. Jennings would agree to sign the escrow agreement. Approximately one month later, Mr. Blanchard contacted Mr. Tobler and informed him that he had not yet had a chance to put together the escrow agreement. Then, on March 22, Mr. Blanchard informed Mr. Tobler that the Hansens wished to work directly with the Eskelsens. Mr. Blanchard stated that he had not prepared an escrow agreement. He also stated that Mr. Tobler should contact him if the Eskelsens did not hear from the Hansens within the

next few days. Mr. Blanchard later testified that when he contacted Mr. Tobler on March 22, he was unaware that the Hansens and Mr. Jennings planned to sell VC Holdings' interest in the Property. Mr. Tobler did not contact Mr. Blanchard within the next few days as requested.

¶12 Ultimately, the Hansens and Mr. Jennings agreed that VC Holdings would sell its ownership interest in JVC Leasing to Theta for $236,337. At that time, Mr. Jennings was the vice president of Theta. Mr. Jennings later testified that he asked Mr. Hansen if he had authority to conduct business on behalf of VC Holdings, and Mr. Hansen confirmed that he did. Mr. Hansen also told Mr. Jennings that the Eskelsens did not have a valid claim to VC Holdings.

¶13 On March 23, 2011, Mr. Engstrom, a partner at Mr. Blanchard's firm, ordered closing documents from Southern Utah Title Company for a transfer of 31.8% of the Property interest from JVC Leasing to VC Holdings and then to Theta. Before closing, Southern Utah Title independently verified that Mr. Hansen had the authority to sign the closing documents for VC Holdings. On March 29, Mr. Hansen, acting as manager of VC Holdings, signed an agreement redeeming VC Holdings' 31.8% membership interest in JVC Leasing. In return, JVC Leasing conveyed a 31.8% interest in the Property to VC Holdings. VC Holdings then sold its 31.8% interest in the Property to Theta for $236,337. After satisfying the $54,270 debt VC Holdings owed to JVC Leasing, Theta placed $180,000 in escrow with Southern Utah Title. Mr. Hansen instructed Southern Utah Title to release the $180,000 to a company called ME Jenkins Management LLC. Mr. Hansen later testified that he used the money for personal expenses instead of repaying the Eskelsens.

¶14 In August 2011, the Eskelsens received notice of the Hansens' chapter 7 bankruptcy filing. That same day, Mr. Tobler searched the relevant recorder's office website and discovered the March 29 transfer documents.

¶15    The Eskelsens sued the Hansens, VC Holdings, and Theta. The Eskelsens sought a judgment declaring that VC Holdings, not Theta, owned the 31.8% interest in the Property. The Eskelsens asserted that (1) the transfer to Theta was void as a fraudulent transfer, (2) even if the transfer was not fraudulent, it was void because Mr. Hansen lacked authority to act as VC Holdings' manager, and (3) even if the transfer was not fraudulent and Mr. Hansen had authority to act as VC Holdings' manager, the transfer was void because it was "outside of the ordinary course of business" and "Mr. Hansen did not have specific authority to transfer away all of VC Holdings' assets."

¶16    After a two-day bench trial, the trial court ruled in Theta's favor. In its written findings of fact and conclusions of law, the court concluded (1) that the March 29, 2011 transfer was not a fraudulent transfer, (2) that the Eskelsens failed to properly remove Mr. Hansen as VC Holdings' manager and Mr. Hansen was therefore VC Holdings' manager on the date of the transfer, (3) and that Mr. Hansen's actions as manager bound VC Holdings.

¶17    After trial, the Eskelsens filed a motion to amend and make additional findings pursuant to rule 52(b) of the Utah Rules of Civil Procedure. The trial court granted the motion in part and denied it in part. The court granted the Eskelsens' motion to amend several clerical errors, such as replacing "Theta" with "JENCO" and "2015" with "2011." But the court "otherwise denied" their motion. The Eskelsens appeal.

ISSUES AND STANDARDS OF REVIEW

¶18    The Eskelsens first contend that the trial court erred in determining that Mr. Hansen "did not commit a fraudulent transfer under the Utah [Uniform] Fraudulent Transfer Act." With regard to this claim, we review questions of fact for clear error and questions of law for correctness. *Tolle v. Fenley*, 2006 UT App 78, ¶ 11, 132 P.3d 63. Although we review questions of

law for correctness, "we may still grant a trial court discretion in its application of the law to a given fact situation." *Id.* (quotation simplified). "Questions of statutory interpretation are questions of law that are reviewed for correctness and no deference is given to the trial court's determination." *Id.*

¶19 Second, the Eskelsens contend that the trial court erred in determining the Eskelsens had the burden of disproving Theta's defense that it was a good faith transferee.[3] "Burden of proof questions typically present issues of law that [we] review[] for correctness." *Martinez v. Media-Paymaster Plus/Church of Jesus Christ of Latter-day Saints*, 2007 UT 42, ¶ 41, 164 P.3d 384.

¶20 Third, the Eskelsens contend that the trial court erred in determining two particular facts. They assert error in the trial court's determination that "Theta . . . did not have notice of the Eskelsens' superior claim." A finding that Theta had notice of the Eskelsens' claim, they assert, means Theta could not have been a good faith transferee. *See* Utah Code Ann. § 25-6-9(1) (LexisNexis Supp. 2015) (stating that a fraudulent transfer "is not voidable . . . against a person that took in good faith and for a reasonably equivalent value"). The Eskelsens also contend that

---

3. In the event of a fraudulent transfer, a third-party transferee may seek to prevent a creditor's remedy of voiding the transfer pursuant to the Utah's Uniform Fraudulent Transfer Act. To do so, the transferee must establish that it took the property in good faith and for reasonably equivalent value. *See* Utah Code Ann. § 25-6-9(1) (LexisNexis Supp. 2015). The parties and the trial court employed various terms describing this status including "bona fide purchaser," "bona fide purchaser for value," "innocent actor," "innocent party," and "innocent purchaser." We do not here attempt to distinguish any of these terms because they each presumably describe the same status. To avoid confusion, we use the term "good faith transferee" because it better comports with the language of the Uniform Fraudulent Transfer Act.

the trial court erred in determining that Mr. Hansen had authority to act on behalf of VC Holdings on March 29, 2011. Theta correctly observes that this issue "depends entirely on the trial court's determination of whether Theta had notice or knowledge of any restrictions on [Mr. Hansen's] authority[,] which is a fact question." *See 4447 Assocs. v. First Sec. Fin.*, 889 P.2d 467, 471 (Utah Ct. App. 1995). "A determination concerning whether a party had notice or knowledge of a particular transaction or occurrence is a finding of fact and will not be set aside" absent clear error. *Id.* (quotation simplified); *see also* Utah R. Civ. P. 52(a)(4) ("Findings of fact, whether based on oral or other evidence, must not be set aside unless clearly erroneous, and the reviewing court must give due regard to the trial court's opportunity to judge the credibility of the witnesses.").

¶21    Fourth, the Eskelsens argue that the trial court erred "by not imputing knowledge through the principal-agency relationship between Theta . . . and its attorneys." "Whether a principal is imputed with its agent's knowledge is a legal question" we review for correctness. *Lane v. Provo Rehab. & Nursing*, 2018 UT App 10, ¶ 23, 414 P.3d 991; *see also Insight Assets, Inc. v. Farias*, 2013 UT 47, ¶ 13, 321 P.3d 1021 (observing that whether a title company's knowledge of a mortgage was imputed to a bank was a question of law). However, whether an agent has knowledge to impute, and what that knowledge is, presents a question of fact, which is we review for clear error. *See id.* (observing that whether a bank had actual knowledge of a mortgage was a question of fact).

¶22    Fifth, the Eskelsens contend that the trial court erred by denying in part their motion to amend and make additional findings of fact under rule 52(b) of the Utah Rules of Civil Procedure. We review the trial court's underlying factual findings for clear error and its ultimate grant or denial of a motion to amend or make additional findings for abuse of discretion. *See Express Recovery Servs. Inc. v. Reuling*, 2015 UT App 299, ¶ 22, 364 P.3d 766 ("We review the trial court's denial

of a motion to amend a judgment for an abuse of discretion." (quotation simplified)); *see also* Utah R. Civ. P. 52(a)(4).

## ANALYSIS

### I. Fraudulent Transfer

¶23    The Eskelsens contend that "[t]he trial court erred in determining [that] the Hansens did not commit a fraudulent transfer." According to the Eskelsens, "even if [the Hansens] did have some form of authority, the transfer of VC Holdings' property interest (in JVC Leasing) is voidable as a fraudulent transfer under the Utah [Uniform] Fraudulent Transfer Act." We are not persuaded.

¶24    Utah's Uniform Fraudulent Transfer Act (the Act) "affords remedies for 'creditors' against 'debtors' who have engaged in fraudulent transfers of property." *See* Utah Code Ann. § 25-6-303 (LexisNexis 2013). Generally, a fraudulent transfer occurs when a debtor (a) transfers property with actual intent to hinder, delay, or defraud any creditor, or (b) transfers property under specified circumstances without receiving reasonably equivalent value in exchange. *See id.* § 25-6-5(1). Under the Act, a creditor may seek to undo or void a debtor's transfer, for example, that fraudulently "plac[es] assets beyond [the] creditors' reach." *Timothy v. Pia, Anderson, Dorius, Reynard & Moss LLC*, 2018 UT App 31, ¶ 11, 424 P.3d 937, *cert. granted*, 421 P.3d 439 (Utah 2018); *see also* Utah Code Ann. §§ 25-6-1 to -14 (LexisNexis 2013).[4]

¶25    Importantly, "[a] fraudulent transfer in Utah first requires a creditor-debtor relationship." *Bradford v. Bradford*, 1999 UT App

---

4. These sections of the code were renumbered in May 2017. *See* Utah Code Ann. §§ 25-6-101 to -104; 25-6-202 to -203; 25-6-302 to -305; 25-6-404 to -406; -502 (LexisNexis 2017).

373, ¶ 14, 993 P.2d 887. A "creditor" is "a person who has a claim," and a "debtor" is "a person who is liable on a claim." Utah Code Ann. § 25-6-2(4), (6). A "claim" under the Act is "a right to payment, whether or not the right is reduced to judgment." *Id.* § 25-6-2(3). The Act may afford relief if the parties' circumstances meet these definitions. As relevant here, a creditor may seek a remedy under the Act only if the claim is against a "debtor" as that term is defined by the Act.

¶26 The trial court concluded that the March 29, 2011 transfer between VC Holdings and Theta was not a fraudulent transfer. First, the court determined that "[t]here is no issue that the Hansens are 'Debtors' under the Act. The Hansens individually borrowed $120,000 from the Eskelsens. Thus a Debtor/Creditor relationship was established." And the parties do not dispute this determination on appeal.

¶27 Next, the court observed that VC Holdings was not a party to the loan between the Eskelsens and the Hansens and that VC Holdings did not owe a debt to the Eskelsens. Therefore, the trial court concluded, VC Holdings was not a "debtor" under the Act, and the Eskelsens' fraudulent transfer claim against VC Holdings necessarily failed. We agree. The record demonstrates that VC Holdings owned the asset at issue—the membership interest in JVC Leasing, which owned the Property—and that VC Holdings transferred its interest in JVC Leasing to Theta. *See generally* Utah Code Ann. § 48-2c-701(2) (LexisNexis 2010) (providing that an asset of the entity belongs to the entity, not its members). VC Holdings was not a party to the loan between the Eskelsens and the Hansens and therefore was not "liable on a claim" to the Eskelsens for the Hansens' default on that loan. *See id.* § 25-6-2(6). Thus, VC Holdings was not a debtor, as that term is defined in the Act, of the Eskelsens. *See id.* Consequently, the Act does not afford the Eskelsens a remedy against Theta.

¶28 Regarding the Eskelsens' fraudulent transfer claim against the Hansens as individuals, the trial court observed that

"JVC Leasing was the owner of the Property, not the Hansens." The court noted that VC Holdings owned an interest in JVC Leasing, and it was VC Holdings' interest in JVC Leasing that was transferred to Theta at the March 29, 2011 closing. Because the Hansens, in their individual capacity, did not own an interest in JVC Leasing, the Hansens "could not and did not transfer any interest in JVC Leasing at the March 29, [2011] closing." The court therefore concluded that the Eskelsens' fraudulent transfer claim against the Hansens also failed. Again, we agree with the trial court.

¶29   The Act defines a "transfer" as "every mode . . . of disposing of or parting with an asset or an interest in an asset." *Id.* § 25-6-2(12). An "asset" is defined as "property of a debtor." *Id.* § 25-6-2(2). Here, the record demonstrates that VC Holdings and JENCO purchased the Property in 2007. In July 2008, VC Holdings and JENCO formed JVC Leasing and transferred 100% of the Property to JVC Leasing. In exchange for the transfer, VC Holdings received a 31.8% interest in JVC Leasing, while JENCO received a 68.2% interest. Thus, JVC Leasing owned the Property, and VC Holdings (not the Hansens individually) owned a 31.8% interest in JVC Leasing.[5] *See id.* § 48-2c-701(2). Although Mr. Hansen signed all of the necessary documents to exchange VC Holdings' 31.8% membership interest in JVC Leasing for a 31.8% interest in the Property, and to then transfer VC Holdings' 31.8% interest in the Property to Theta, Mr. Hansen was acting as manager of VC Holdings, not in an individual capacity. Consequently, we agree with the trial court that the Hansens "could not and did not transfer any interest in JVC Leasing at the March 29, 2011 closing." We therefore conclude that, because the Hansens did not transfer "property of a debtor," the Act does not afford the Eskelsens a remedy against the Hansens.

---

5. The Eskelsens acknowledge these facts in their briefing on appeal.

¶30   The record also does not establish, and the Eskelsens do not directly argue, that VC Holdings was Mr. Hansen's "alter ego" so that the sale of VC Holdings' interest in JVC Leasing could nevertheless be considered a transfer of a debtor's property. Under the "alter ego" doctrine, a court may disregard a corporate entity and hold an individual liable as a debtor if there is a concurrence of two circumstances:

> (1) there must be such unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist, viz., the corporation is, in fact, the alter ego of one or a few individuals; and (2) the observance of the corporate form would sanction a fraud, promote injustice, or an inequitable result would follow.

*Norman v. Murray First Thrift & Loan Co.*, 596 P.2d 1028, 1030 (Utah 1979). Courts have referred to the first prong as the "formalities requirement." *d'Elia v. Rice Dev., Inc.*, 2006 UT App 416, ¶ 30, 147 P.3d 515. A non-exclusive list of factors courts consider in determining whether this prong has been met includes:

> (1) undercapitalization of a one-[person] corporation; (2) failure to observe corporate formalities; (3) nonpayment of dividends; (4) siphoning of corporate funds by the dominant stockholder; (5) nonfunctioning of other officers or directors; (6) absence of corporate records; [and] (7) the use of the corporation as a facade for operations of the dominant stockholder or stockholders.[6]

---

6. We note that while most of these factors apply to traditional corporations, the alter ego doctrine applies equally to Utah limited liability companies, though there is little case law

(continued…)

*Colman v. Colman*, 743 P.2d 782, 786 (Utah Ct. App. 1987). Courts have referred to the second prong as the "fairness requirement," and its satisfaction is left "to the conscience of the court." *d'Elia*, 2006 UT App 416, ¶ 30 (quotation simplified). Both prongs of the *Norman* test must be met in order to make an alter ego claim. *See Lodges at Bear Hollow Condo. Homeowners Ass'n, Inc. v. Bear Hollow Restoration, LLC*, 2015 UT App 6, ¶ 12, 344 P.3d 145.

¶31 Nothing in the record establishes that there was no meaningful separation between Mr. Hansen and VC Holdings at the time of the loan, or that Mr. Hansen did not observe proper formalities or keep proper records as an owner, or that funds between VC Holding and Mr. Hansen were being comingled when he was an owner. Additionally, nothing suggests that the loan was for VC Holdings. The trial court did reach an alternative conclusion on the issue of whether the Hansens' actions could be considered a fraudulent transfer if the Hansens' and VC Holdings's interests could "somehow be melded together so as to become a 'Debtor.'"[7] But because it is not established, or even argued, that there was a melding together or unity of VC Holdings and Mr. Hansen's interests so as to prove that he was the alter ego of VC Holdings, we need not and do not undertake that inquiry.

---

(…continued)

developing this area of law. *See d'Elia v. Rice Dev., Inc.*, 2006 UT App 416, ¶ 26 n.5, 147 P.3d 515. *See generally* Allen Sparkman, *Will Your Veil Be Pierced? How Strong Is Your Entity's Liability Shield?-Piercing the Veil, Alter Ego, Ego, and Other Bases for Holding an Owner Liable for Debts of an Entity*, 12 Hastings Bus. L.J. 349 (2016).

7. The trial court determined that this claim would fail because the Eskelsens provided no evidence that VC Holdings did not receive a reasonably equivalent value in exchange for the transfer.

¶32    Based on the foregoing, we decline to disturb the trial court's conclusions.

## II. Theta's Affirmative Defense

¶33    The Eskelsens next contend that "[t]he trial court erred in determining [that] the Eskelsens had the burden of proving Theta Investment's affirmative defense" that Theta was a good faith transferee. More specifically, the Eskelsens assert that Theta had the burden of showing that it "paid valuable consideration and did so without notice" in order to be protected as a good faith transferee, and that the trial court incorrectly shifted that burden to the Eskelsens. Theta, on the other hand, contends that because "[t]he Eskelsens never demonstrated a fraudulent transfer," "the burden never shifted to Theta on its affirmative defense." We agree with Theta.

¶34    Section 25-6-5(1) of the Act provides that a fraudulent transfer occurs when a debtor (a) transfers property with actual intent to hinder, delay, or defraud any creditor, or (b) transfers property under certain circumstances without receiving reasonably equivalent value in exchange. Utah Code Ann. § 25-6-5(1) (LexisNexis 2013). The party bringing a claim has the burden of demonstrating that a fraudulent transfer has occurred. Generally, the transfer is voidable once a fraudulent transfer has been established. However, section 25-6-9(1) of the Act provides an affirmative defense if the transferee took the property (1) in good faith (2) for reasonably equivalent value. *Id.* § 25-6-9(1). The burden of establishing both elements as a defense to avoidance of the transfer is on the transferee. Where a debtor makes a transfer "with actual intent to hinder, delay, or defraud any creditor of the debtor," *see id.* § 25-6-5(1)(a), the Uniform Law Commission's official comment on the Transfer Act provides that any person wishing to invoke the defense set forth in section 25-6-9(1) "carries the burden of establishing good faith and the reasonable equivalence of the consideration exchanged," *see* Uniform Fraudulent Transfer Act § 8 cmt. 1 (Nat'l Conference of Comm'rs on Unif. State Laws, 1984), http://www.uniformlaws.or

g/shared/docs/fraudulent%20transfer/UFTA_Final_1984.pdf
[https://perma.cc/9P93-2JQ5].

¶35    Here, the trial court did not find that the underlying transaction was voidable as a fraudulent transfer, and thus, the burden never shifted to Theta to prove that it took the Property in good faith and for reasonably equivalent value. Consequently, we conclude that the trial court committed no error on this issue.

### III. Theta's Knowledge

A.    The Eskelsens' Competing Claim to the Property

¶36    The Eskelsens next contend that the trial court erred in determining certain facts. First, it determined that Theta, via Mr. Jennings, did not have notice of the Eskelsens' claim to VC Holdings and the Property, and therefore Theta could not have been a good faith transferee. *See* Utah Code Ann. § 25-6-9(1) (LexisNexis Supp. 2015). According to the Eskelsens, "[t]he December 27, 2010 letter sent to Mr. Jennings . . . gave actual notice of the Hansens' lack of authority" to act on VC Holdings' behalf and transfer its interest in JVC Leasing to Theta. They further assert that the December 2010 letter "was sufficient information to create a duty to investigate the Eskelsens' claim further" and "amounted to inquiry notice."

¶37    In the context of the good faith transferee defense "[i]t is notice, not knowledge, that the purchaser must have, and it need not be actual notice[—]constructive notice is sufficient to defeat the purchaser's claim." *Meyer v. General Am. Corp.*, 569 P.2d 1094, 1097 (Utah 1977). Constructive notice, such as inquiry notice, "can occur when circumstances arise that should put a reasonable person on guard so as to require further inquiry on his part." *Id.*; *see also FDIC v. Taylor*, 2011 UT App 416, ¶¶ 36–39, 267 P.3d 949 (observing that "Utah courts recognize both actual notice and constructive notice," and "constructive notice can include . . . inquiry notice which is presumed because of the fact that a person has knowledge of certain facts which should

impart to him, or lead him to, knowledge of the ultimate fact" (quotation simplified)). Here, the trial court concluded that Mr. Jennings was made aware of the Eskelsens' claim when he received the December 2010 letter, and that Mr. Jennings therefore "had a duty to inquire about the Eskelsens' claims." The court further concluded that Mr. Jennings had indeed conducted "a reasonable inquiry into the Eskelsens' claims."

¶38 Specifically, the court found that upon receipt of the December 2010 letter, Mr. Jennings immediately responded with his own letter asking for "documentary proof of the transition of ownership," but that the Eskelsens never responded to that request. Mr. Jennings also asked Mr. Hansen about the Eskelsens' claim, and Mr. Hansen told Mr. Jennings that their claim was not valid and that he (Mr. Hansen) had authority to sign for VC Holdings. Mr. Jennings then searched the Utah Department of Commerce's website and saw that Mr. Hansen was listed as the manager for VC Holdings. Theta conducted the closing through Southern Utah Title Company, which had performed its own search of the Department of Commerce's website and found that Mr. Hansen was listed as manager of VC Holdings. Theta also received a title commitment that did not show any encumbrances to JVC Leasing's interest in the Property.

¶39 The court further found that (1) Mr. Jennings relied on Mr. Hansen's representations and the documents he signed to determine that Mr. Hansen "had authority to execute the closing documents," (2) "Mr. Jennings relied on Southern Utah Title Company's determination that [Mr.] Hansen had authority to execute the closing documents," (3) Theta "paid sufficient value to VC Holdings for [Mr.] Hansen to pay his debts," and (4) both Mr. Jennings and Mr. Blanchard separately believed that Mr. Hansen intended to pay his debts. Although the Eskelsens asserted that Mr. Jennings should have contacted them a second time when he did not hear back from them in response to his letter requesting "documentary proof" of their claims, the court determined that "[t]he ball, so to speak, was in the Eskelsens[']

court and they had the duty to provide the information Mr. Jennings requested."

¶40 "[T]o successfully challenge a trial court's factual findings on appeal, the appellant must overcome the healthy dose of deference owed to factual findings by identifying and dealing with the supportive evidence and demonstrating the legal problem in that evidence, generally through marshaling the evidence." *Taft v. Taft*, 2016 UT App 135, ¶ 19, 379 P.3d 890 (quotation simplified). "[A] party who fails to identify and deal with supportive evidence will never persuade an appellate court to reverse under the deferential standard of review that applies to factual findings." *Id.* (quotation simplified).

¶41 Theta is correct that, on appeal, the Eskelsens do not marshal the supportive evidence or challenge "the trial court's extensive findings that the inquiry was exhaustive and turned up nothing." Rather, they make claims about what Mr. Jennings and Theta should have known or might have learned had they investigated further. For example, the Eskelsens assert that "[h]ad [Mr. Jennings] investigated further or possibly inquired of his own attorneys he would have learned the Eskelsens' claim was legitimate." They also assert that "relying on the Utah Department of Commerce's website . . . was inadequate" because "Mr. Jennings himself had not update[d] the Department's website when he moved from vice-president to president of Theta . . . for at least three to four years, indicating he should know it is not a reliable source for definitive information."

¶42 The Eskelsens' self-serving statements do not discharge their burden of demonstrating that the trial court's findings are not adequately supported by the record. *See Taft*, 2016 UT App 135, ¶ 19. Because the Eskelsens have "not adequately marshaled the evidence" and have "otherwise failed" to demonstrate clear error, "we presume that the evidence supports the trial court's finding" that Theta, via Mr. Jennings, conducted a reasonable

inquiry into the Eskelsens' claim. *See Grimm v. DxNA LLC*, 2018 UT App 115, ¶ 17, 427 P.3d 571.

### B.    Mr. Hansen as Manager of VC Holdings

¶43    The Eskelsens also contend that "[t]he trial court erred in determining [that] the Hansens had authority to act for VC Holdings on March 29, 2011." VC Holdings was established as a manager-managed company. At the time the transfer took place, manager-managed companies were governed under the Utah Revised Limited Liability Company Act.[8] This act required initial managers to be "designated in the articles of organization"; and afterwards "managers shall be those persons identified in documents filed with the division." Utah Code Ann. § 48-2c-804(1). New managers must be elected by members holding a majority of interest in the company. *Id.* § 48-2c-804(6)(a). Moreover, a manager need not be a member of the company. *Id.* § 48-2c-804(6)(d). A manager will serve as such until "death, withdrawal, or removal." *Id.* § 48-2c-804(6)(i). Therefore, as Theta notes, "losing membership status does not automatically strip a person of their position as a manager."

¶44    The Eskelsens assert that Mr. Hansen lacked the authority to act on behalf of VC Holdings. As part of this argument they assert that "[a]s they became the sole members of VC Holdings, [they] removed the Hansens as managers and placed themselves in that position." Thus, according to the Eskelsens, because the Hansens were no longer managers of VC Holdings, they "could not act on behalf of the company."

---

8. The Utah Revised Limited Liability Company Act became effective on July 1, 2001, but was repealed January 1, 2016. "Because we apply the law as it existed at the time of the events giving rise to this suit . . . we apply the Act as it existed before the revised act became effective." *Taghipour v. Jerez*, 2002 UT 74, ¶ 5 n.1, 52 P.3d 1252.

¶45 At trial, the Eskelsens asserted that they properly foreclosed on the Hansens' membership interests in VC Holdings pursuant to Utah Code section 70A-9a-620. The trial court agreed and determined that "[t]he security agreement . . . was properly foreclosed and the Eskelsens obtained the ownership interests of VC Holdings." However, the trial court disagreed with the Eskelsens' additional assertions that (1) when the Eskelsens obtained ownership of VC Holdings, "they removed the Hansens as managers and placed themselves in that position" and (2) the "Hansens were no longer managers of VC Holdings and could not act on behalf of the company." Instead, the court concluded that Mr. Hansen was the manager of VC Holdings on March 29, 2011:

> Because the Eskelsens, as new members of VC Holdings, did not properly remove Mr. Hansen as the manager of VC Holdings; did not file a certificate of amendment pursuant to paragraph 8.1(a) of the Operating Agreement; and, did not dispute the Division's website prior to the March 29, 2011 closing, . . . Mr. Hansen, not the Eskelsens, was the Manager of VC Holdings on March 29, 2011.

¶46 On appeal, the Eskelsens do not engage with the reasoning behind the trial court's conclusion that Mr. Hansen was the manager of VC Holdings on March 29, 2011. *See Hi-Country Estates Homeowners Ass'n v. Jesse Rodney Dansie Living Trust*, 2015 UT App 218, ¶ 5, 359 P.3d 655 ("[A]n appellant must address the basis for the district court's ruling."); *Golden Meadows Props., LC v. Strand*, 2010 UT App 257, ¶ 17, 241 P.3d 375 (explaining that an appellant cannot demonstrate that a district court erred if it "fails to attack the district court's reasons" for its decision). Instead, as Theta correctly observes, "[t]he Eskelsens proceed as though it was established that they removed [Mr.] Hansen as manager of VC Holdings and installed themselves to that position." The Eskelsens have failed to provide any meaningful authority or reasoned analysis

challenging the trial court's finding that the Eskelsens did not remove Mr. Hansen as manager of VC Holdings. *See* Utah R. App. P. 24(a)(8). Because the Eskelsens have failed to address the trial court's reasoning on this issue they have failed to carry their burden of persuasion on appeal, and we do not disturb the trial court's determination that Mr. Hansen was VC Holdings' manager when the transaction with Theta closed.

C.     Mr. Hansen's Authority as Manager

¶47     The Eskelsens next assert that "the Hansens' actions on March 29, 2011, exchanging VC Holdings' interest in JVC Leasing for an interest in [the Property] and then transferring that real property interest to Theta Investment was done without authority because the Hansens . . . did not have the Eskelsens' approval."

¶48     Utah Code section 48-2c-802 provides that, in a manager-managed company,

> an act of a manager, including the signing of a document in the company name, for apparently carrying on in the ordinary course of the company business, or business of the kind carried on by the company, *binds the company unless the manager had no authority to act for the company in the particular matter and the lack of authority was expressly described in the articles of organization or the person with whom the manager was dealing knew or otherwise had notice that the manager lacked authority*.

Utah Code Ann. § 48-2c-802(2)(c) (LexisNexis 2010) (emphasis added).

¶49     Here, the trial court observed that VC Holdings' Articles of Organization contain "no express language limiting Mr. Hansen's authority, as Manager, to transfer VC Holdings['s] assets." However, VC Holdings's Operating Agreement contains

a prohibition on managers' actions. Specifically, article 5.4 of the Operating Agreement provides:

> Notwithstanding any other provision of this Agreement, without the approval of Members whose aggregate Membership Interest is at least 51 percent, the Managers may take no action with respect to: the sale, lease, exchange, mortgage, pledge or other disposition of all or substantially all of the Company's assets . . . .

Based on Utah Code section 48-2c-802 and article 5.4 of the Operating Agreement, the court determined that the issue was "whether Mr. Jennings knew that Mr. Hansen had to have VC Holdings' members' approval before participating in the March 29, 2011 closing." Observing that the Eskelsens had "presented no evidence at trial regarding this issue," the court concluded that Mr. Jennings had no knowledge of article 5.4's requirements.

¶50 Theta correctly observes that the Eskelsens do not challenge the trial court's finding that Mr. Jennings did not have notice of any restriction on Mr. Hansen's authority to act pursuant to section 5.4 of VC Holdings' Operating Agreement. Rather, the Eskelsens acknowledge the trial court's finding and continue to assert that Mr. Jennings "had significant and continual notice of the Eskelsens' claim," which "must amount to knowledge that the Hansens lacked authority" to act on behalf of VC Holdings.

¶51 As previously discussed, however, the court found that Mr. Jennings conducted a reasonable inquiry into the Eskelsens' claim. Mr. Jennings asked for "documentary proof" of their claim but never received it. Mr. Jennings spoke with Mr. Hansen about his authority to act on VC Holdings' behalf. He also searched the Department of Commerce's website and discovered that Mr. Hansen was listed as VC Holdings' manager. As the trial court observed, the "simple act" of

updating the Department of Commerce's website, as required by section 8.1(a) of VC Holdings' Operating Agreement, would have "provided part of the additional proof that Mr. Jennings requested" from the Eskelsens. That update also would have put Southern Utah Title, which conducted its own search of the Department of Commerce's website, on notice that the Eskelsens' did not intend to retain Mr. Hansen as the manager of VC Holdings.

¶52    In addition, pursuant to Utah Code section 48-2c-121, "Articles of organization that have been filed with the [state division of corporations] constitute notice to third persons . . . of all statements set forth in the articles of organization that are . . . expressly permitted to be set forth in the articles of organization by [Utah Code section] 48-2c-403(4)." Utah Code Ann. § 48-2c-121(1) (LexisNexis 2010). Utah Code section 48-2c-403(4) further provides, in relevant part, "The articles of organization may contain any other provision not inconsistent with law, including . . . a statement of whether there are limitations on the authority of managers or members to bind the company and, if so, what the limitations are . . . ."

¶53    Here, the trial court correctly recognized that, although section 5.4 of VC Holdings' Operating Agreement contained a restriction on Mr. Hansen's authority to act, the company's articles of organization, which are a matter of public record, did not contain a similar restriction on authority. Thus, the trial court appropriately considered whether Mr. Jennings knew of section 5.4's requirement "that Mr. Hansen had to have VC Holding[s's] members['] approval before participating in the March 29, 2011 closing," and the court concluded that Mr. Jennings had no notice or knowledge of section 5.4's restriction on Mr. Hansen's authority.

¶54    The trial court found additional support for its conclusion that Mr. Jennings had no knowledge of any restrictions on Mr. Hansen's authority under article 5.5 of the Operating

Agreement, titled "Agency Power and Authority," which provides:

> A Manager apparently acting for the Company in the usual course of business has the power to bind the Company and *no person has an obligation to inquire into the Manager's actual authority to act on the company's behalf*. However, if a Manager acts outside the scope of the Manager's actual authority, the Manager will indemnify the Company for and costs of damages it incurs as a result of the unauthorized act.

(Emphasis added.) The court observed that each of the Hansens signed a "Resolution of Members" authorizing the sale of VC Holdings' ownership interest in JVC Leasing. And although neither of the Hansens were actually members of VC Holdings on March 29, 2011,[9] "no evidence was produced at trial that Mr. Jennings was aware of that fact." Because Mr. Jennings "had known and done business with Mr. Hansen . . ., and VC Holdings for years," the court determined that Mr. Jennings had no obligation to make further inquiries regarding member approval as to Mr. Hansen's authority to act.

¶55    On appeal, the Eskelsens fail to acknowledge the trial court's findings regarding section 5.5 of the Operating Agreement. *See Golden Meadows Props., LC v. Strand*, 2010 UT App 257, ¶ 17, 241 P.3d 375 (explaining that an appellant cannot demonstrate that a district court erred if it "fails to attack the district court's reasons" for its decision). Consequently, they have not carried their burden of demonstrating that the trial court's findings regarding section 5.5 were not adequately supported by the record. *See Taft v. Taft*, 2016 UT App 135, ¶ 19, 379 P.3d 890.

---

9. A manager of a company "need not be a member of the company." Utah Code Ann. § 48-2c-804(6)(d) (LexisNexis 2010).

¶56   In sum, the Eskelsens have not demonstrated clear error in the trial court's findings relating to Mr. Hansen's authority to act, and its findings that Theta and Mr. Jennings had no notice or knowledge of the restrictions in section 5.4 of VC Holdings's Operating Agreement are adequately supported by the evidence. Consequently, we are not persuaded the trial court erred in determining that Mr. Hansen had the authority to act on VC Holdings's behalf on March 29, 2011, the date the Property was transferred.

IV. The Principal-Agency Relationship

¶57   The Eskelsens next contend that "[t]he trial court erred by not imputing knowledge through the principal-agency relationship between Theta Investment and its attorneys." According to the Eskelsens, "[t]hrough his attorneys"—Mr. Blanchard and Mr. Engstrom—"Mr. Jennings had full knowledge of the loan between the Eskelsens and the Hansens because Mr. Blanchard had actually drafted those agreements." "Further," the Eskelsens assert, "Mr. Jennings knew the only reason the Eskelsens were not taking further steps to exclude the Hansens after accepting their membership interest in VC Holdings is because of a tentative agreement to allow the Hansens to broker a sale," i.e., the escrow agreement. We are not persuaded.

¶58   To begin, Mr. Blanchard prepared the loan agreement for the Hansens, not Mr. Jennings. Pursuant to the Restatement (Third) of the Law Governing Lawyers, "[u]nder traditional agency principles, a lawyer's knowledge relating to the representation is attributed to the lawyer's client." Restatement (Third) of the Law Governing Lawyers § 28 cmt. B (Am. Law Inst. 2000). *Id.* § 28 cmt. b. But "[a] client is not charged with a lawyer's knowledge concerning a transaction in which the lawyer does not represent the client." *Id. See generally* Utah R. Prof'l Cond. 1.6(a) ("A lawyer shall not reveal information relating to the representation of a client unless the client gives informed consent . . . ."). Thus, the fact that Mr. Blanchard

prepared the loan agreement for the Hansens in one transaction does not automatically impute his knowledge of that transaction to a different client—Mr. Jennings—in a different transaction.

¶59 Moreover, at trial, Mr. Blanchard struggled to remember the loan agreement he prepared for the Hansens. He was unsure whether he wrote it or whether a paralegal wrote it under his direction. Mr. Blanchard could tell from the agreement that he sent it to the Hansens with blanks for them to fill in. He could not recall if he was present when the agreement was signed, and he did not "remember ever having a signed copy." When asked if he recalled preparing the loan agreement at the time he spoke with Mr. Tobler, Mr. Blanchard stated, "It's possible I had forgotten. I think I remembered, but maybe I—maybe I didn't. Again, I didn't pull it up. I didn't look at it. I didn't see it. Frankly, I didn't spend a lot of time on it." Mr. Engstrom was not called to testify at trial.

¶60 The trial court listened to the testimony of Mr. Jennings and Mr. Blanchard and declined to find that Mr. Blanchard knew what the Eskelsens claim he should have known and that any of Mr. Blanchard's knowledge should be imputed to Mr. Jennings. *See American Fork City v. Thayne*, 2012 UT App 130, ¶ 4, 279 P.3d 840 (per curiam) ("We defer to the trial court's ability and opportunity to evaluate credibility and demeanor." (quotation simplified)). Indeed, the court found that if "Mr. Jennings is deemed to know what Mr. Blanchard knew, he would know that Mr. Blanchard contacted Mr. Tobler in March and informed him (Mr. Tobler) that Mr. Hansen wanted to work directly with the Eskelsens and that he (Mr. Blanchard) would not be preparing an escrow agreement." The court found that when Mr. Blanchard sent that email to Mr. Tobler, Mr. Blanchard "did not know there was any plan between the Hansens and Mr. Jennings to sell the property interest at issue." The court also found that "[Mr.] Jennings and [Mr.] Blanchard separately believed that [Mr.] Hansen intended to pay the debts he had."

¶61    Based upon the trial court's advantaged position in judging credibility and resolving conflicts in the evidence, and the deference we thus owe it, we conclude that the court did not err in declining to impute unproven "knowledge" to Mr. Jennings or Theta.

V. The Eskelsens' Motion to Amend

¶62    Finally, the Eskelsens assert that "[t]he trial court erred in denying in part [their] motion to amend its findings." According to the Eskelsens, "the Trial Court made a few incorrect Findings of Fact" that "*potentially* had a significant impact on the Court's conclusions." (Emphasis added.)

¶63    First, the Eskelsens challenge paragraph 31 of the trial court's findings of fact, which states, "Mr. Tobler never gave Mr. Blanchard the Foreclosure Letter or the signed Agreements." The Eskelsens assert that the court should also have found that "Mr. Blanchard actually drafted those exact agreements and remembered that fact at the time he was discussing these matters with Mr. Tobler." Thus, according to the Eskelsens, "it is really of no significance that Mr. Tobler did not provide [Mr. Blanchard] with signed agreements because [Mr. Blanchard] already knew exactly what was in them."

¶64    At trial, however, Mr. Blanchard had no clear recollection on the matter:

> Q. At the time you're talking to [Mr.] Tobler, did you recall that you had done the promissory note and pledge agreement that . . . formed the basis of the debt between the Eskelsens and the Hansens, or had you maybe forgotten that?
>
> A. It's possible I had forgotten. I think I remembered, but maybe I—maybe I didn't. Again, I didn't pull it up. I didn't look at it. I didn't see it. Frankly, I didn't spend a lot of time on it . . . .

In addition, he was unsure whether he wrote the loan agreement or whether a paralegal wrote it under his direction. Mr. Blanchard could not recall whether he was present when the agreement was signed, and he did not "remember ever having a signed copy."

¶65   "We defer to the trial court's ability and opportunity to evaluate credibility and demeanor." *American Fork City v. Thayne*, 2012 UT App 130, ¶ 4, 279 P.3d 840 (per curiam) (quotation simplified). Here, the trial court listened to Mr. Blanchard's testimony and had the opportunity to evaluate his credibility and demeanor. Based on that testimony, the trial court reasonably could have determined that Mr. Blanchard did not have any specific memory of the loan agreement he prepared for the Hansens and the Eskelsens. Consequently, we cannot conclude that the court exceeded its discretion in declining to make the Eskelsens' requested finding.

¶66   Second, the Eskelsens challenge paragraph 32 of the trial court's findings of fact, which states, "Mr. Tobler never discussed [Mr. Jennings's] request for documents with Mr. Blanchard." According to the Eskelsens, Mr. Blanchard testified that "he did not remember it being discussed, not that it was never discussed." At trial, the following exchange with Mr. Blanchard took place:

> Q. Did Mr. Tobler ever tell you about a document request from [Mr.] Jennings?
>
> A. No, I don't remember that.
>
> Q. Did Mr. Tobler[,] during these conversations in January, February, and March of 2011, did Mr. Tobler provide you with any documentary proof that . . . the Hansens' interests were validly foreclosed on?
>
> A. No. Again, we did not—that was not a heavy item of discussion.

The trial court heard Mr. Blanchard's testimony and observed his demeanor at trial. Based on Mr. Blanchard's testimony, the court reasonably could infer that Mr. Blanchard did not remember Mr. Tobler telling him about a document request from Mr. Jennings because that conversation never occurred.

¶67   Third, the Eskelsens challenge paragraph 45 of the trial court's findings of fact, which states, "[O]n March 22, 2011, Mr. Blanchard informed Mr. Tobler that [Mr.] Hansen wanted to work directly with the Eskelsens and that he (Mr. Blanchard) would not be preparing an agreement." (Emphasis omitted.) The Eskelsens assert that it was not until May 2011, that Mr. Blanchard informed Mr. Tobler that he would not be preparing an escrow agreement. According to the Eskelsens, the timing of these communications is of "paramount" concern because it "lulled [them] into continuing to wait for a mutually beneficial outcome involving all parties."

¶68   But the email Mr. Blanchard sent to Mr. Tobler on March 22, 2011, also stated, "If your clients don't hear from [Mr. Hansen] in the next day or so please let me know." Thus, Mr. Blanchard's email indicated he was waiting to hear from Mr. Tobler, and Mr. Blanchard testified at trial that he did not receive a response from Mr. Tobler or the Eskelsens "in the next day or so" and "at that point [he] thought it was done and resolved." Mr. Tobler confirmed at trial that he did not contact Mr. Blanchard in the next couple of days to let him know whether Mr. Hansen had spoken with the Eskelsens. Based on the foregoing, we agree with Theta that "the trial court could reasonably infer and therefore find, as it did, that as of March 22, the Eskelsens were to work directly with the Hansens and that [Mr.] Blanchard would not be preparing any agreement unless he heard otherwise from [Mr.] Tobler."

¶69   Lastly, we note that the Eskelsens have failed to explain, in the context of the trial court's unchallenged findings, what impact these allegedly incorrect findings had on the trial court's ultimate conclusions. Rather, the Eskelsens merely assert that

"[t]hese incorrect findings *potentially* had a significant impact on the Court's conclusions." (Emphasis added.) That is not sufficient to demonstrate that the trial court exceeded its discretion in declining to amend its findings. *See* Utah R. Civ. P. 61 ("The court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties.").

## CONCLUSION

¶70   We conclude that Utah's Uniform Fraudulent Transfer Act does not afford the Eskelsens a remedy against Theta, VC Holdings, or the Hansens. In addition, the trial court did not err in determining that Mr. Jennings conducted a reasonable inquiry into the Eskelsens' claim, that Theta and Mr. Jennings had no notice or knowledge of any restrictions on Mr. Hansen's authority to act, and that Mr. Hansen had the authority to act on behalf of VC Holdings on March 29, 2011. Lastly, we conclude that the trial court did not exceed its discretion when it denied the Eskelsens' motion to amend and make additional findings of fact. The judgment of the trial court is affirmed.