2023 UT App 45

## THE UTAH COURT OF APPEALS

MICHAEL DANIEL HEATH, HEATH ENTERPRISE, INC. AND HEATH
ENTERPRISES UTAH, INC.,
Appellants,
*v.*
DIVISION OF CONSUMER PROTECTION
AND DEPARTMENT OF COMMERCE,
Appellees.

Opinion
No. 20210362-CA
Filed April 27, 2023

Fifth District Court, Cedar City Department
The Honorable Matthew L. Bell
No. 170500129

James W. Jensen, Attorney for Appellants

Sean D. Reyes and Stanford E. Purser,
Attorneys for Appellees

JUDGE MICHELE M. CHRISTIANSEN FORSTER authored this Opinion,
in which JUDGES DAVID N. MORTENSEN and RYAN M. HARRIS
concurred.

CHRISTIANSEN FORSTER, Judge:

¶1 The Utah Division of Consumer Protection (the Division) issued two citations against Michael Daniel Heath (Mr. Heath), Heath Enterprise, Inc., and Heath Enterprises Utah, Inc., (collectively, Heath) for numerous violations of the Utah Administrative Code and the Utah Consumer Sales Practices Act (UCSPA). After exhausting its administrative remedies, Heath filed a petition for review in the district court challenging the citations. The district court found nine violations and fined Heath $20,000. On appeal, Heath raises numerous challenges to the court's ruling, which we largely reject. However, we vacate three

of the violations—one of them because the district court inappropriately found it sua sponte and two others because the court evaluated them using the wrong mens rea standard. We remand for the court (1) to reevaluate the two violations under the appropriate mens rea standard and (2) to determine whether Heath's fine should be reassessed in light of the vacated violations.

BACKGROUND

¶2     Mr. Heath is the owner of Heath Enterprise, Inc. and Heath Enterprises Utah, Inc., which operate an auto repair shop in New Harmony, Utah, called Freeway Tire. As part of their sales efforts, Mr. "Heath and his Freeway Tire employees engage in a business practice that [Mr.] Heath calls 'merchandising the island,' which involves pointing out to drivers who stop at Freeway Tire any possible problems with their vehicles (like worn tires) and offering to fix those problems." Freeway Tire employees are paid on commission rather than based on an hourly wage or salary.

¶3     In response to complaints it received about Freeway Tire, the Division conducted an investigation and issued two citations against Heath for violations of the UCSPA. Following two hearings, an administrative law judge (ALJ) found that Heath had committed numerous violations of the UCSPA. The ALJ's findings and conclusions were affirmed by the Department of Commerce. After exhausting its administrative remedies, Heath filed petitions for judicial review with respect to both citations in district court. The district court consolidated the cases.

¶4     In the course of a two-day trial de novo, the district court heard evidence of violations relating to four of Freeway Tire's customers: Anderson, Wagner, Smith, and Albert.

¶5     Anderson stopped at Freeway Tire to buy ice. A Freeway Tire employee approached him and told him that the two front tires on his motorhome had cracks and should be replaced. The

employee verbally quoted Anderson $600 for the new tires, and Anderson agreed, but the employee did not provide Anderson anything in writing or obtain his signature on a written estimate. When Anderson returned to pay after the work was done, he received an invoice for $1,121.54. Anderson signed the invoice and paid by credit card.

¶6 Wagner's tire went flat near New Harmony, Utah, while he was moving across the country with all his possessions in his car, and went to Freeway Tire for repairs. A Freeway Tire employee recommended that Wagner replace both front tires as well as his left half-axle. The employee gave a verbal estimate of $1,200, and Wagner agreed. The next day, the employee called Wagner and told him he needed a second new half-axle and increased the estimate to $1,500. The employee later called a second time and told Wagner he needed new front brakes and rotors and increased the estimate to $1,800. Wagner verbally agreed to each new estimate. Wagner did not provide any written authorization for any of the repairs prior to the time they were performed. Upon returning to pick up his car, Wagner was presented with two invoices totaling $2,829.27. Wagner signed the invoices at that time. The employee who helped Wagner claimed at trial that he had given Wagner "the exact amount" of both invoices over the phone. Wagner later filed a customer complaint with his credit card company, which ultimately refunded him $600.

¶7 Smith was towing a trailer through Utah when he stopped at Freeway Tire for gas. While Smith was pumping gas, a Freeway Tire employee approached him and told him his trailer was making a noise when he pulled up. The employee offered to inspect the trailer, to which Smith agreed. The employee then pulled the trailer into the garage and began removing parts from it, telling Smith they were broken and needed to be replaced. The employee wrote an estimate of $468 for parts and $150 for labor on a scrap of paper. Smith agreed to the amount but did not sign the paper. After completing the repairs, the employee gave Smith an invoice for $1,343.23. Despite protesting the amount, Smith

ultimately signed the invoice and paid. At trial, the employee stated that the quote was "per side."

¶8 Albert was driving a truck and towing a trailer to Arizona on I-15 when an employee of Freeway Tire flagged him down. The employee told Albert that the right rear tire on his trailer was "wobbling so badly it looked like it was about to fall off" and that something was wrong with the trailer's shackle. The employee directed Albert to follow him back to Freeway Tire. At Freeway Tire, another employee told Albert that the trailer's shock absorber was blown out and "strongly recommended" that he replace all four shocks "to make sure he had a safe journey." The employee told Albert that he "had shocks in stock that were correct for Albert's trailer." He told Albert that "it was common for RVs to have this particular shock and the shock has to be 'custom ordered,'" so the employee "kept them on hand so he could fix RVs." The employee said the shocks were "heavy duty, custom ordered" and cost $365 a pair. The employee later denied telling Albert that his trailer was unsafe or that the shocks were special order.[1] Albert did not receive a written estimate of repairs until they were completed. After the repairs were finished, the employee gave Albert an invoice for $1,018.10. Albert signed the invoice and paid with a credit card.

¶9 For various reasons, Albert suspected Freeway Tire had not been forthright with him. Upon arriving home, he contacted a local parts store and learned that the shocks cost less than $30 each and that they were neither a custom part nor heavy duty. An expert at trial testified that shock absorbers were not necessary for safety on Albert's trailer and that most RVs do not have shocks at all. Another expert testified that broken shocks could be removed rather than replaced.

---

1. Neither the parties nor the district court attempted to distinguish between "custom" and "special" order and used the terms interchangeably, so for purposes of this opinion, we do the same.

¶10    Mr. Heath testified that he considers a "special order" to be anything that he orders "in a greater quantity than his supplier has on hand at a given time." Heath's expert similarly testified that "'special order' means anything he needs to make sure he gets in, and can include things that he keeps in stock on his shelves." An expert witness for the Division of Consumer Protection, on the other hand, testified that a special order is something "ordered for a specific customer" and that an item is not a special order if "several are kept in inventory." Albert believed a special order was something not readily available in stores.

¶11    After trial, the Division moved to amend one of its citations to add a new rule violation it had not previously alleged—that Heath had intentionally understated costs to Smith.

¶12    In a lengthy written ruling entered after trial, the district court found that Heath had committed the following nine violations:

1. Materially misstating the estimate of the cost to repair Anderson's vehicle in violation of rule R152-11-5(A)(10) of the Utah Administrative Code;

2. Failing to obtain Anderson's express authorization prior to performing repairs to his vehicle in violation of rule R152-11-5(A)(1);

3. Knowingly making material misstatements in estimating the cost to repair Wagner's vehicle in violation of rule R152-11-5(A)(10);

4. Failing to obtain Wagner's express authorization for the repairs to his vehicle prior to performing them in violation of rule R152-11-5(A)(1);

5. Knowingly making material misstatements in estimating the cost to repair Smith's vehicle in violation of rule R152-

11-5(A)(10) (the new rule violation raised by the Division after trial) or, alternatively, knowingly charging Smith for repairs to which he did not previously agree in violation of Utah Code section 13-11-4(2)(r);

6. Knowingly failing to obtain Smith's express authorization for the repairs to his vehicle prior to performing them in violation of rule R152-11-5(A)(1);

7. Knowingly misrepresenting to Albert that his trailer was dangerous in violation of rule R152-11-5(A)(9);

8. Knowingly misrepresenting to Albert that his shocks were special order in violation of Utah Code section 13-11-4(2)(d), which prohibits representing that the subject of a consumer transaction was "available to the consumer for a reason that does not exist," and Utah Code section 13-11-4(2)(b), which prohibits representing that the subject of a consumer transaction was "of a particular standard, quality, grade, style, or model" when it was not; and

9. Knowingly misrepresenting to Albert that the shocks were "the exactly right shock" for his trailer in violation of Utah Code section 13-11-4(2)(b).

The ninth violation identified by the court was not raised by the Division but was found sua sponte by the district court.

¶13　In assessing the appropriate penalty, the court found that Heath's conduct had spanned multiple years, Heath had targeted vulnerable drivers far from home, its violations had caused substantial harm to individual consumers, it had not cooperated with investigation efforts, it had a long history of consumer complaints, it had done little to change its conduct, it had engaged in business practices that incentivize employees to engage in illegal conduct, and it had made minimal effort to mitigate the harm it caused because of the revenue it stood to make by

continuing its deceptive practices. Based on these findings, the district court imposed a fine of $20,000 against all defendants jointly and severally and permanently enjoined Heath from engaging in further violations of the UCSPA.

ISSUES AND STANDARDS OF REVIEW

¶14    First, Heath challenges the district court's consideration of matters not raised in the administrative proceedings, asserting that the court exceeded the scope of its de novo review. "Whether a court has authority to resolve an issue between the parties is a question of law," which we review for correctness. *Warner v. Warner*, 2014 UT App 16, ¶ 14, 319 P.3d 711.

¶15    Second, Heath argues that the district court misinterpreted rule R152-11-5(A)(1) of the Utah Administrative Code when it interpreted that provision to require suppliers to obtain a customer's express authorization prior to performing automotive repairs. We review the interpretation of administrative rules for correctness. *See Utah Chapter of Sierra Club v. Air Quality Board*, 2009 UT 76, ¶ 13, 226 P.3d 719.

¶16    Third, Heath argues that the district court applied the wrong mens rea standard in finding violations of rule R152-11-5(A)(10). This issue also involves the interpretation of an administrative rule, which we review for correctness. *See id.*

¶17    Fourth, Heath challenges the district court's findings[2] that Freeway Tire employees made misrepresentations in telling Albert that his trailer was in a dangerous condition and that the shocks sold to him were special order. "We review a court's

---

2. Heath attempts to frame these issues as legal challenges to the district court's interpretation of the administrative rules and the Utah Code. However, we agree with the Division that these issues are more properly characterized as challenges to the district court's factual findings and therefore review them as such.

findings of fact for clear error . . . ." *Seamons v. Wiser*, 2020 UT App 33, ¶ 11, 462 P.3d 387.

¶18 Finally, Heath challenges the district court's determination that Mr. Heath was a supplier, as defined by Utah Code section 13-11-3(6), who could be held jointly and severally liable for the violations. The parties dispute whether this is a legal or factual question, but because we ultimately decline to consider the issue on grounds of inadequate briefing, we need not resolve their dispute.

ANALYSIS

I. De Novo Review

¶19 Heath's first argument concerns matters addressed by the district court that Heath believes were beyond the scope of the court's authority to consider on de novo review from an administrative proceeding. There are two parts to this argument: first, that the court lacked authority to consider alleged violations not raised in the administrative proceedings and, second, that the court lacked authority to consider mens rea evidence regarding violations the Division maintained did not require a mens rea element.

A.    New Violations

¶20 Heath first alleges that the district court erred by considering violations that were not raised in the administrative proceedings in its de novo review: (1) the new violation relating to Smith raised by the Division for the first time after trial and (2) the additional violation relating to Albert that the district court recognized, sua sponte, for the first time after trial.

¶21 Our supreme court has held that in "an action for judicial review of final agency action, . . . unpreserved claims are foreclosed." *Friends of Great Salt Lake v. Utah Dep't of Nat. Res.*, 2017

UT 15, ¶ 60, 393 P.3d 291. "Only those issues that were brought to the factfinder's attention at the administrative level may be litigated in the de novo review in the district court." *Taylor-West Weber Water Improvement Dist. v. Olds*, 2009 UT 86, ¶ 12, 224 P.3d 709; *accord Friends*, 2017 UT 15, ¶ 58. As "*review* implies an analysis of the claims and defenses raised in the proceeding under review," the "failure to preserve . . . claims . . . is accordingly preclusive of [an] attempt to assert them in an amended complaint." *Friends*, 2017 UT 15, ¶ 59.

¶22 With regard to the Smith violation, the district court granted the Division's request "to amend its administrative citation to conform to proof after trial pursuant to" rule 15 of the Utah Rules of Civil Procedure. *See generally* Utah R. Civ. P. 15(b)(1) (permitting a party to amend its pleadings "to conform them to the evidence and to raise an unpleaded issue"). While we question whether rule 15 could appropriately be used to amend the original administrative citation, any error in amending the citation was harmless in light of the fact that the district court found this violation as an "alternative" to its determination that Heath knowingly charged Smith for repairs to which he did not previously agree in violation of Utah Code section 13-11-4(2)(r), an allegation that *was* raised and adjudicated during the administrative proceedings.

¶23 As to the court's sua sponte determination that Heath violated Utah Code section 13-11-4(2)(b) by knowingly misrepresenting to Albert that the shocks were "the exactly right shock" for his trailer, we agree with Heath that such a determination was beyond the scope of the court's authority. Because this violation was neither contained in the administrative citation nor considered in the administrative proceedings, it could also not be considered in the first instance in the district court. Thus, we vacate the court's findings and conclusions regarding this violation and direct it, on remand, to assess whether the absence of this violation affects its ruling as to the appropriate fine to impose.

B.      Mens Rea Evidence

¶24    Continuing with its assertion that de novo review must be limited to issues raised in the underlying administrative proceeding, Heath also argues that the district court should not have considered any evidence of its knowledge or intent to violate the Division's regulations or the UCSPA. Heath maintains that the Division's administrative citations did not plead, and argument in the administrative proceedings did not preserve, the knowledge or intent element in the course of administrative review and, instead, the Division "vehemently argued that knowledge or intent was not required for Rule violations." Heath therefore asserts that any argument regarding the knowledge or intent element for each violation was not preserved for the district court's review.

¶25    But the fact that the Division took the position that proof of knowledge or intent was not required for certain violations does not mean that the issue of whether Heath had the necessary mens rea was unpreserved or inadequately pleaded. "An issue is preserved by presenting it to the [tribunal] in such a way that the [tribunal] has an opportunity to rule on that issue." *Fort Pierce Indus. Park Phases II, III & IV Owners Ass'n v. Shakespeare*, 2016 UT 28, ¶ 13, 379 P.3d 1218 (quotation simplified). Moreover, the adequacy of a pleading depends not on the use of "magic words . . . in the pleadings" but on "whether the [tribunal] and the parties were aware of the issues involved." *Jones, Waldo, Holbrook & McDonough v. Dawson*, 923 P.2d 1366, 1374 (Utah 1996) (quotation simplified).

¶26    In ruling on Heath's argument that any evidence of knowledge or intent should be disregarded, the district court found that "[w]hile the Division did not use the words 'knowingly or intentionally' in its administrative citations when alleging the separate counts . . . , the administrative citations alleged, in sufficient detail, the specific conduct comprising the alleged violations and the knowing or intentional conduct." The court also found that Heath "raised the issue of knowledge and

intent with respect to all violations at the administrative hearings, such that the issue was fully presented and briefed multiple times at the administrative level by both parties." Heath does not challenge this finding by the district court or point us to any evidence of knowledge and intent provided to the district court that was not presented to the ALJ and the Department of Commerce. Thus, we have no basis to conclude that the district court erred in considering evidence of Heath's knowledge and intent on de novo review.

## II. Express Authorization

¶27　Heath next argues that the district court erred by concluding that a supplier violates rule R152-11-5(A)(1) of the Utah Administrative Code when it does not obtain a customer's express authorization prior to performing repairs. "We review administrative rules in the same manner as statutes. Therefore, we interpret the rule as a whole, giving effect to each word, and harmonizing the various parts wherever possible." *Dorsey v. Department of Workforce Services*, 2012 UT App 364, ¶ 12, 294 P.3d 580 (quotation simplified), *aff'd*, 2014 UT 22, 330 P.3d 91.

¶28　Rule R152-11-5(A)(1) states that it is "a deceptive act or practice" to "[f]ail to obtain the consumer's express authorization for repairs, inspections, or other services." Utah Admin. Code R152-11-5(A)(1). It further requires that the authorization "be obtained only after the supplier has clearly explained to the consumer the anticipated repairs, inspection or other services to be performed, the estimated charges for those repairs, inspections or other services, and the reasonably expected completion date of such repairs, inspection or other services to be performed." *Id.* Finally, for any services over $50, "a transcript or copy of the consumer's express authorization shall be provided to the consumer on or before the time that the consumer receives the initial billing or invoice." *Id.* "Express authorization" is defined as "a written agreement signed [or electronically authorized] by the consumer." *Id.* R152-11-1(B)(3).

¶29    Heath asserts that so long as it obtains a customer's express authorization at the same time it provides an invoice for services, it has complied with rule R152-11-5(A)(1) and that it need not obtain express authorization prior to completing services. However, we agree with the district court that this reading of the rule is inconsistent with its language and that the rule should instead be read to require a customer's express authorization prior to the time repairs begin.

¶30    By its plain language, the rule requires a supplier to obtain the express authorization "after the supplier has clearly explained to the consumer the *anticipated* repairs, inspection or other services *to be performed*, the *estimated* charges for those repairs, inspections or other services, and the *reasonably expected completion date* of such repairs, inspection or other services *to be performed*." *Id.* R152-11-5(A)(1) (emphasis added). This emphasized language suggests that the customer will provide the authorization before services are completed. Otherwise, there would be no need to inform the customer of the anticipated services and repairs, the estimated cost, or the expected completion date; if the customer provides express authorization after services are complete, then this information would already be known. As the district court correctly noted, if the repairs have already been performed, they "would no longer be 'anticipated,' the completion date would no longer be 'expected,' and the charges would be known rather than 'estimated.'" Further, the rule's language requiring that the customer be provided with "a copy" of their express authorization on or before the time they receive their invoice suggests that the express authorization is something that would be given prior to the services being performed rather than something the customer would receive and sign contemporaneously with receiving an invoice.

¶31    Notably, the following subsection of the rule also makes it a deceptive practice not to obtain express authorization "for additional, unforeseen, but necessary, repairs, inspections, or other services" amounting to 10% or more of the original estimate. *Id.* R152-11-5(A)(2). If all that was needed for an express

authorization was final approval after all services are completed, there would be no need to require intermediate approval for additional repairs exceeding the initial estimate.

¶32 Having reviewed the language of the rule, we conclude that the only reasonable interpretation is that it requires suppliers to obtain express authorization prior to performing services. Accordingly, the district court did not err in determining that Heath's knowing failure to obtain such authorization from Anderson, Wagner, and Smith violated rule R152-11-5(A)(1).

### III. Mens Rea

¶33 Heath's next argument concerns the mens rea required for a violation of rule R152-11-5(A)(10). This rule prohibits "[i]ntentionally understat[ing] or . . . materially [misstating] the estimated cost of repairs, inspections, or other services." Utah Admin. Code R152-11-5(A)(10). While the district court found that Heath committed three such violations with respect to Anderson, Wagner, and Smith,[3] the court found that it did so "knowingly." The Division concedes that "the district court stated the wrong mens rea standard." We therefore vacate the district court's conclusions regarding Anderson and Wagner and remand for the limited purpose of allowing the court to reassess the Division's allegations under the appropriate standard and determine whether Heath's misstatements to Anderson and Wagner were intentional.

---

3. The district court's finding that Heath "knowingly materially misstated the estimate of the cost of repairs to Smith's vehicle . . . by giving an estimate for only half the vehicle without clearly informing Smith that this was only a half estimate" was an alternative to the court's finding that Heath knowingly charged Smith for repairs to which Smith did not previously agree. *See supra* ¶¶ 12, 22. Because we affirm that alternative finding, our limited remand does not require the court to reassess the alleged rule R152-11-5(A)(10) violation relating to Smith.

IV. Challenges to Factual Findings

¶34     Heath next challenges the district court's findings that its employees knowingly made misrepresentations when they told Albert (1) that his trailer was in a dangerous condition and (2) that the shocks were a custom order. However, these challenges amount merely to a rearguing of the evidence presented at trial and do not demonstrate that the district court clearly erred.

¶35     "A trial court's factual determinations are clearly erroneous only if they are in conflict with the clear weight of the evidence, or if this court has a definite and firm conviction that a mistake has been made." *Kimball v. Kimball*, 2009 UT App 233, ¶ 14, 217 P.3d 733 (quotation simplified). "A party who fails to identify and deal with supportive evidence will never persuade an appellate court to reverse under the deferential standard of review that applies to factual findings." *Eskelsen v. Theta Inv. Co.*, 2019 UT App 1, ¶ 40, 437 P.3d 1274 (quotation simplified).

¶36     Here, Heath merely identifies the evidence that supports its assertion that Albert's broken shocks did in fact present a dangerous condition and that identifying the shocks as a custom order was not a misrepresentation. It does not deal with the contrary evidence on which the district court relied.

¶37     With respect to the safety representation, the district court cited evidence that shocks are not necessary for a trailer's safety and that a broken shock can be removed rather than replaced. Based on this evidence, the district court found that "Albert's trailer did not require replacing the shocks to remedy a dangerous condition," contrary to the representations of Heath's employees, and that Heath's employees falsely told Albert "the trailer was unsafe without new shocks" because they "had a financial incentive . . . to instill in the potential customer a sense of urgency to have repairs done at Freeway Tire, because Freeway Tire paid mechanics only on commission." The evidence was sufficient to support a determination that Heath's employees misrepresented to Albert that his trailer was unsafe.

¶38 With respect to the "custom order" representation, the court acknowledged that there was conflicting evidence about the meaning of custom or special order. Both Albert and his expert testified that they considered "special order" to mean something that was not readily available in stores. The court rejected the testimony of Heath's expert and Mr. Heath regarding their understanding of special order because it did not consider their definition to be consistent with how "a reasonable consumer would understand that term." The court found that Heath's employee "made the representation to quell Albert's hesitance and surprise at the high price of the shock and to convince Albert the shocks were worth their hefty price." The evidence was sufficient to support the district court's determination that the employee had represented to Albert that the shocks were "available . . . for a reason that does not exist," *see* Utah Code § 13-11-4(2)(d), or were "of a particular standard, quality, grade, style, or model" when they were not, *see id.* § 13-11-4(2)(b).

¶39 Because the evidence was sufficient to support the district court's findings that Heath's employees made misrepresentations about the dangerousness of Albert's trailer and whether the shocks were "custom order," we affirm the district court's findings on those points.

## V. Supplier

¶40 Finally, Heath argues that Mr. Heath, personally, could not be considered a "supplier" under Utah Code section 13-11-3(6)[4] and therefore could not be held personally liable for any violations committed by the Heath companies. While this argument implicates interesting questions relating to piercing the

---

4. The Utah Code defines a supplier as "a seller, lessor, assignor, offeror, broker, or other person who regularly solicits, engages in, or enforces consumer transactions, whether or not he deals directly with the consumer." Utah Code § 13-11-3(6).

corporate veil and the personal liability of an owner, we ultimately conclude that it is inadequately briefed.

¶41    Heath's entire argument consists of a single paragraph asserting that there was no evidence that Mr. Heath acted in his individual capacity or that he was even present for most of the transactions. While Heath mentioned issues regarding corporate officer immunity and piercing the corporate veil in its reply brief and at oral argument, it did not develop any arguments relating to these concepts in its opening brief on appeal. *See generally Porenta v. Porenta*, 2017 UT 78, ¶ 33, 416 P.3d 487; *Coleman v. Stevens*, 2000 UT 98, ¶ 9, 17 P.3d 1122. Because Heath's arguments regarding the supplier issue are inadequately briefed, we decline to address this issue. *See State v. Thomas*, 961 P.2d 299, 304 (Utah 1998) ("It is well established that a reviewing court will not address arguments that are not adequately briefed.").

CONCLUSION

¶42    We agree with Heath that the district court, in the context of a review of administrative proceedings, did not have the authority to find a violation sua sponte. Accordingly, we vacate the district court's finding of a violation based on misrepresentations to Albert that the shocks were "the exactly right shock" for his trailer.

¶43    We also agree with Heath that the district court did not apply the correct mens rea standard in finding violations of rule R152-11-5(A)(10). Accordingly, we vacate the district court's rulings regarding violations related to the cost of repairs for Anderson's vehicle and Wagner's vehicle, and we remand those counts to the district court for determination of whether the estimates were intentionally misstated.

¶44    On remand, the district court should reassess the appropriateness of the $20,000 fine it originally imposed in light

of the vacated sua sponte finding and its revised findings regarding the rule R152-11-5(A)(10) violations.

¶45    We affirm the district court in all other respects. Its alternative finding based on its amendment of the citation was harmless, and it was not beyond the scope of the court's authority to consider evidence of knowledge and intent relating to the alleged violations. The district court correctly interpreted the express authorization provision of rule R152-11-5(A)(1), and its factual findings regarding misrepresentations made by Freeway Tire employees were supported by the evidence and not clearly erroneous. And Heath's arguments regarding whether Mr. Heath was a supplier were inadequately briefed.

———————